735 F.2d 101
 84-2 USTC P 9530, 15 Fed. R. Evid. Serv. 1362
 UNITED STATES of America, Appellant in No. 83-5344, Appellee
in No. 83-5380, Cross-Appellee in No. 83-5384,
v.
Jerome ASHFIELD, Appellee in No. 83-5344, Cross-Appellant in
No. 83-5384,
v.
Sanford STORM, Appellant in No. 83-5380.
 Nos. 83-5344, 83-5380 and 83-5384.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 27, 1984.
Decided June 1, 1984.
Certiorari Denied Oct. 1, 1984.
See 105 S.Ct. 189.
 
 W. Hunt Dumont, U.S. Atty., Faith Hochberg (argued), Asst. U.S. Atty., Jonathan S. Feld, Asst. U.S. Atty., Newark, N.J., for U.S.A.
 Lawrence S. Horn, (argued), Trent S. Dickey, Sills, Beck, Cummis, Zuckerman, Radin & Tischman, Newark, N.J., for Jerome Ashfield.
 Kostelanetz & Ritholz, New York City, and Gutkin, Miller, Shapiro & Selesner, P.A., Millburn, N.J., Boris Kostelanetz, Lawrence S. Feld (argued), Edward M. Spiro, James C. Sherwood, Elliot Silverman, New York City, for Sanford Storm; Howard D. Cohen, Newark, N.J., of counsel.
 Before ADAMS and SLOVITER, Circuit Judges, and TEITELBAUM, District Judge.*
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 This appeal comes to us from the trial of Sanford Storm and Jerome Ashfield, two business associates who were charged with attempted evasion of personal income taxes. After a jury returned guilty verdicts against each defendant, the trial court sustained Storm's conviction, but ruled that the evidence against Ashfield was insufficient and entered a judgment of acquittal in his favor. On appeal, a careful examination of the record leaves us satisfied that Storm's conviction should be affirmed. We are, however, compelled to differ with the trial court's weighing of the evidence against Ashfield. While the record here, as with most white-collar crimes, consists of a complex web of inferential proof, we are persuaded that the evidence is sufficient to support the jury's verdict against Ashfield. We therefore reverse the judgment of acquittal for Ashfield and affirm the conviction of Storm.
 
 I.
 
 2
 Storm and Ashfield are the sole shareholders and officers of National Talent Associates (NTA), a closely held corporation that placed child models for television, magazine and catalog advertising. NTA essentially acted as a referral service for another, larger talent agency. After locating interested parents by direct mail, NTA would select suitable children, execute a 5-year contract with the parents, photograph the aspiring child model, and send the picture to the Schuller Talent Agency, which would in turn accept about one in twenty referrals and arrange job interviews for them. For this service, NTA charged a one-time fee of $135 to $165 when the contract was signed. Thereafter, NTA received a commission of 10% of a child's earnings up to $1000, and 15% of any additional earnings.
 
 
 3
 NTA established two corporate bank accounts. The first, the management trust account, was the repository for compensation paid by employers for the work of the child models. From these payments, NTA deducted its commission and sent a check for the remainder to the client. NTA's commission earnings were then transferred to the second corporate account, the operating account.
 
 
 4
 Within NTA's operating account were various categories such as commission income (the 10% or 15% fees transferred from the management trust account), sales income (the $135 to $165 one-time registration fee), and officers' loans receivable (outlays and repayments for personal expenses of Storm and Ashfield).[1] All payments to the operating account were credited as sales income, unless specifically designated for deposit to some other category.
 
 
 5
 During an audit of NTA, the Internal Revenue Service (IRS) discovered that between 1973 and 1975 almost $60,000 from the trust account was deposited in the officers' loans account and credited in equal amounts to Storm and Ashfield as repayment of personal loans. As a result of these loan repayments, each defendant in effect received $30,000 in dividends that twice escaped taxation. Because the deposits were never listed as income to NTA, no corporate tax was paid on them, and because the deposits were never reported as income to Storm and Ashfield, no personal tax was paid on them.
 
 
 6
 In April 1982, Storm and Ashfield were indicted on eight counts of evading corporate and personal income tax in 1974 and 1975. Six of the eight counts were, however, dismissed as barred by the statute of limitations, leaving only two counts in place: one count each for Storm and Ashfield for attempted evasion of personal income tax in 1975.[2]
 
 
 7
 At trial, the defendants did not contest that the loan repayments had been incorrectly credited to them. Rather, the defense asserted lack of "willfulness" on the part of Storm and Ashfield. In particular, Storm attempted to show through cross-examination of the government's witnesses that the repayments were erroneously recorded because of a mistake by NTA's accounting firm. Ashfield's defense was that he had no control over NTA's accounting practices and that he was unaware of the errors. Neither Storm nor Ashfield took the stand, and no other witness testified on behalf of the defense.
 
 
 8
 On February 9, 1983, the jury returned a guilty verdict against each defendant. But on April 11, 1983, the district court granted a motion for acquittal of Ashfield, ruling that "reasonable minds could not have concluded that all of the elements of the crime charged were established beyond a reasonable doubt...." App. at 44a. The district court, however, left in place the jury's guilty verdict against Storm, and on May 19, 1983, sentenced him to 90 days imprisonment, three years probation, and a $5000 fine. Timely appeals were filed by Storm, by the government (appealing Ashfield's acquittal) and by Ashfield (defensively cross-appealing the trial court's denial of his motion for a new trial).
 
 II.
 
 9
 Although both defendants assert that the district court committed errors requiring us to order a new trial, the central issue before us is the sufficiency of the evidence against Storm and, particularly, against Ashfield. Because a ruling that the proof adduced at trial was inadequate would be dispositive of both of the defendants' appeals, we consider that issue first.
 
 A.
 
 10
 To establish guilt of tax evasion under 26 U.S.C.A. Sec. 7201 (West Supp.1983), the government must show: (1) the existence of a tax deficiency, (2) an affirmative act constituting an attempted evasion of payment of taxes, and (3) willfulness. Sansone v. United States, 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965). Neither Storm nor Ashfield challenge the proof of the first two elements of the crime; they contest only the proof of the last element--willfulness.
 
 
 11
 For purposes of Sec. 7201, willfulness is defined as the voluntary, intentional violation of a known legal duty. See U.S. v. Pomponio, 429 U.S. 10, 11-13, 97 S.Ct. 22, 23-24, 50 L.Ed.2d 12 (1976) (per curiam); U.S. v. Bishop, 412 U.S. 346, 359-60, 93 S.Ct. 2008, 2016-17, 36 L.Ed.2d 941 (1973). Willfulness, may however, be inferred from circumstantial evidence. The Supreme Court has made clear that willful tax evasion may be proven by a consistent pattern of underreporting large amounts of income and by the taxpayer's failure to include all his income on his books and records. Holland v. U.S., 348 U.S. 121, 139, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). See Spies v. U.S., 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1942). Likewise in this circuit, we have often held that repetitious conduct resulting in underpayment of taxes may be sufficient to show willfulness. U.S. v. Alker, 260 F.2d 135, 148 (3d Cir.1958) ("consistent understatement [of tax liability] is evidence of willfulness"); U.S. v. Frank, 245 F.2d 284, 287-88 (3d Cir.1957) (proof of a consistent pattern of underreporting "is itself enough" to sustain a jury finding of willful tax evasion). See also U.S. v. Greenlee, 517 F.2d 899, 903 (3d Cir.1975) ("a two year pattern of derelictions ... [is] itself indicative of the willfulness"). Recently, our Court reversed a decision to acquit an accused tax evader, holding that the evidence was sufficient given the proof of a long-run pattern of reporting at variance with the taxpayer's defense, the substantiality of the sums the taxpayer failed to report, and the number of times taxpayer received income checks he claimed to have forgotten. U.S. v. Doan, 710 F.2d 124, 126 (3d Cir.1983). Obviously, these decisions pertaining to the permissible scope of a jury's inferences from circumstantial evidence are necessarily fact-intensive and therefore not subject to easy generalization. Nonetheless, it is clear that a jury may find a defendant's tax evasion was willful wholly on the basis of inferential proof.
 
 
 12
 In the case at hand, the jury was carefully instructed on the meaning of willfulness. The court explained that
 
 
 13
 in this case the attempt to evade or defeat the tax must be a willful attempt, that is to say it must be an attempt made voluntarily and intentionally and with specific intent to keep from the government a tax imposed by the income tax laws which it was the legal duty of the defendants to pay to the government and which the defendants knew it was their legal duty to pay.
 
 
 14
 App. at 895a. Having heard this definition as well as seven days of testimony, the jury found that both Ashfield and Storm were guilty of the crime charged in their indictment--that is, that they "did knowingly and willfully attempt to evade and defeat a large part of the income tax due and owing ... to the United States." App. at 891a; see App. at 892a, 910a-911a.
 
 
 15
 Given those verdicts, the trial court's ruling on the sufficiency of the evidence is governed by strict principles of deference to a jury's findings. In deciding whether to grant the motions for acquittal, the trial court was required to view the evidence in the light most favorable to the prosecution and to draw all reasonable inferences therefrom in the government's favor. See Glasser v. U.S., 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); U.S. v. Jannotti, 673 F.2d 578, 598 (3d Cir.1982) (in banc). Viewing the evidence in this light, the trial court was obliged to uphold the jury's verdict unless no rational jury could conclude beyond a reasonable doubt that the defendants willfully attempted to evade their tax obligations. See Burks v. U.S., 437 U.S. 1, 16-17, 98 S.Ct. 2141, 2149-50, 57 L.Ed.2d 1 (1978); Doan, supra, 710 F.2d at 127; Jannotti, supra, 673 F.2d at 598.
 
 
 16
 In our review of the sufficiency of the evidence, we must apply the same standard of deference to the jury's findings. See Burks, supra, 437 U.S. at 17, 98 S.Ct. at 2150; U.S. v. Dixon, 658 F.2d 181, 188 (3d Cir.1981). Thus, we must independently re-examine the record and determine as a matter of law whether the evidence could support an inference of guilt beyond a reasonable doubt. See Jannotti, supra, 673 F.2d at 598. Our task is not to decide what we would conclude had we been the finders of fact; instead, we are limited to determining whether the conclusion chosen by the factfinders was permissible.
 
 B.
 
 17
 After hearing argument on Storm's motion for acquittal, the district court announced that "there was more than ample evidence in the record to justify the jurors in determining and assessing guilt of Mr. Storm beyond a reasonable doubt." App. at 994. We agree.
 
 
 18
 As the officer in charge of NTA's bookkeeping, Storm was responsible for producing the financial records which were in turn used by NTA's accounting firm to prepare the corporation's tax returns. App. at 174a, 234a. Most importantly, Storm's bookkeeping duties included the task of filling out the internal deposit slips. These slips designated the source of money being deposited in NTA's operating account and the particular category of the operating account--such as officers' loans or commission income--to which the money was to be credited. App. at 240a, 242a, 337a, 342a. Under NTA's accounting practices, unidentified deposits were treated as sales income. App. at 241a. The accountants could not credit a deposit to any category other than sales income without an express designation on the internal deposit slip or specific instructions from Storm himself. App. at 244a-45a, 342a, 419a, 421a, 436a. Consequently, any deposit credited as a repayment to the officers' loans account had to be requested--directly or indirectly--by Storm.
 
 
 19
 Between 1973 and 1975, a series of repayments to the officers' loan account followed a consistent pattern. In 1975, checks for $20,000 and $8,000 were drawn from the management trust account and deposited in the operating account as officers' loan repayments, divided equally between Storm and Ashfield. App. at 482a, 647a, 730a. In 1974, by the same procedure, $9,000 and then $6,000 from the trust account were credited as loan repayments. App. at 526a, 660a, 662a, 665a. Likewise in 1973, $6,500 and then $10,000 were transferred from the trust account to the loan account. App. at 661a-65a. For three consecutive years, therefore, the same method was used to understate the corporate income of NTA and the personal income of the defendants.
 
 
 20
 In view of Storm's control of the NTA books and especially the designation of deposits to the officers' loan account, a rational jury could conclude beyond a reasonable doubt that the three-year pattern of misreported loan repayments was the product of a voluntary and intentional effort by Storm to evade payment of taxes. When we consider, in addition, certain other inculpatory facts, we must conclude that the evidence against Storm rises well above the level necessary to sustain a guilty verdict. Storm had taught accounting, App. at 686a, and accordingly there can be little question that he understood the implications of crediting a deposit as an officers' loan repayment. More significantly, there is evidence that Storm sought to conceal the records pertaining to the management trust account and thereby arguably evinced consciousness of the impropriety of using commission earnings to repay officers' loans. Before the IRS audit, none of NTA's accountants knew of the management trust account or of the separate ledger maintained for it. App. at 325a, 331a. When the IRS served a summons on NTA requesting all financial records, Storm produced no document containing any reference to the trust account and, through his attorney, claimed that the production was complete. App. at 689a-90a. Placed alongside the other evidence, this evidence of attempted concealment by a person trained in bookkeeping confirms that the district court properly denied Storm's motion for acquittal.
 
 C.
 
 21
 Less compelling is the evidence against Ashfield because, in contrast to Storm, he did not directly participate in preparing NTA's bookkeeping entries. Nevertheless, viewing the evidence in the light most favorable to the government, as we must, we believe that the record was sufficient to sustain the jury's guilty verdict against Ashfield.
 
 
 22
 The district judge reached the opposite conclusion in a brief oral opinion that relies on U.S. v. Forrest, 620 F.2d 446 (5th Cir.1980).[3] By focusing on the Forrest case, the district judge intimated his concern that Ashfield was convicted merely on the basis of his close business association with Storm. In Forrest, the Fifth Circuit held that a wife's guilty knowledge could not be inferred simply from the fact that she was married to the kingpin of a large-scale illegal operation. 620 F.2d at 451. The Forrest court emphasized:
 
 
 23
 That one is married to, associated with, or in the company of a criminal does not support the inference that that person is a criminal or shares the criminal's guilty knowledge.
 
 
 24
 Id. (footnotes omitted). We do not take exception with this statement; rather we believe that the evidence of Ashfield's participation in a tax evasion scheme goes well beyond a mere professional association with Storm.
 
 
 25
 Between 1973 and 1975, Ashfield borrowed $29,000 of corporate funds and spent it for such personal expenses as tuition payments for his child at Rider College and individual income tax payments to the IRS. App. at 532a, 534a. For a person whose maximum reported income during this three-year period reached approximately $41,000 in 1975, App. at 675a, these loans from NTA were not negligible. The jury could reasonably infer that Ashfield was aware of his substantial personal indebtedness to the corporation.
 
 
 26
 To repay this debt legally, Ashfield should have deposited funds from his personal, after-tax income in NTA's operating account and designated these deposits as repayments to his loan account. Ashfield did this only once, however, during the period 1973-75. In 1975, he endorsed a $4,000 salary check--from which tax had been withheld--and deposited it as a loan repayment. App. at 750a-51a. From this evidence, a rational jury could infer that Ashfield knew the proper method to be employed in repaying his loans from NTA.
 
 
 27
 In contrast to this one legal repayment of $4,000, the record shows that from 1973 to 1975 seven deposits totalling almost $60,000 were transferred from the trust account and credited one-half to Ashfield as loan repayments. App. at 674a-82a. This repetition of a particular transaction whereby corporate funds were used to repay the officers' personal debts would support an inference that the deposits were being misreported by plan, not by accident. The question left open by this pattern of misreporting is whether Ashfield willfully participated in the arrangement, either by affirmative act or by tacit approval.
 
 
 28
 When we consider the record as a whole, we are persuaded, based on the inferential proof, that a jury could rationally conclude beyond a reasonable doubt that Ashfield at least tacitly approved of his fellow officer's tax evasion scheme. The record links Ashfield to one of the series of transactions by which the tax evasion scheme was implemented. In 1973, Ashfield wrote a $6,500 check on the trust account and deposited it in the operating account as a loan repayment, equally divided between him and Storm. App. at 661a. Each of the other six transfers of NTA income from the trust account to the officers' loan account during 1973-75 were evenly divided between Ashfield and Storm. Since nothing in the evidence indicates that NTA's accounting system ordinarily required the officers to repay their loans in equal and simultaneous sums, the jury could infer that the loan repayments were being shared intentionally. It seems improbable that Ashfield's business associate would be so scrupulously honest about splitting the profits of the tax evasion scheme if Ashfield were unaware of its existence. This inference is strengthened by the evidence that these loan repayments permitted Ashfield to escape a substantial proportion of his personal income tax during 1973-75, rising from nineteen per cent in 1973, to twenty per cent in 1974, and to thirty-six per cent in 1975. App. at 676a, 678a, 682a. These do not appear to be the sort of insignificant amounts that an experienced business executive would easily overlook.
 
 
 29
 Our review of this evidence is further influenced by Ashfield's substantial role in the management of a successful enterprise. Since its incorporation in 1969, Ashfield was a fifty per cent shareholder and one of the two officers of NTA, a firm that realized gross income exceeding $452,000 in 1975. App. at 608a. As the corporation's vice president, Ashfield's responsibilities included supervising NTA's pension plan and investments. App. at 336a, 768a. Moreover, although Ashfield did not prepare NTA's bookkeeping records, he did attend financial meetings with the accountants. App. at 190a-91a, 324a-26a. At none of the meetings did he disclose the existence of the trust account. When he filled out a tax preparation questionnaire from the firm's accountants, Ashfield certified that there was no income other than that disclosed on the records of NTA's operating account. App. at 296a-98a, 764a-65a.
 
 
 30
 When Ashfield's managerial and ownership role at NTA is viewed alongside all the evidence of his profitable involvement with the officers' loan account, we believe that the record is adequate to support a jury finding that Ashfield willfully participated in a tax evasion scheme. The district court's judgment of acquittal must therefore be reversed. We do not, however, mean by this holding to foreclose the district court from reconsidering Ashfield's motion for a new trial. The district judge denied that motion "for the record," App. at 45a, without stating his reasons and immediately after granting Ashfield an acquittal. Consequently, his ruling may have been premised on the view that the acquittal mooted the motion for a new trial. Given our decision today, and the fact that the district judge's focus on U.S. v. Forrest, 620 F.2d 446 (5th Cir.1980), may indicate his concern that the jury's deliberations were tainted by the spillover effect of evidence against Storm, we expressly leave open to the district court, in its discretion, the option of considering a renewed motion for a new trial of Ashfield. Cf. U.S. v. Dixon, 658 F.2d 181, 193 (3d Cir.1981).
 
 III.
 
 31
 Having determined that the evidence was sufficient to support the guilty verdicts rendered against both defendants, we turn to Storm and Ashfield's[4] assertion that during their trial the district court committed reversible error.
 
 A.
 
 32
 The defendants claim that the district court erroneously excluded a hearsay statement suggesting that the misreporting of income occurred by mistake. Specifically, the defense sought at trial to establish that Irwin Giblen, owner of NTA's accounting firm (Giblen & Co.), had characterized the treatment of the loan repayments as an "accounting error." Because Giblen died prior to trial, this comment could be admitted only as a "statement against interest" under Fed.R.Evid. 804(b)(3). After a special hearing on admissibility, the trial court ruled that this comment, at least as recalled by accountant Donald Smith, was not a statement against interest and was therefore inadmissible hearsay. Storm and Ashfield contend that this ruling constitutes an incorrect application of the rules of evidence.
 
 
 33
 At the hearing held to determine the admissibility of the Giblen hearsay statement, Smith testified that prior to meeting with an IRS agent to discuss the investigation, he received instructions from Giblen as to "how to deal with the revenue agent." App. at 441a. Smith at first maintained that Giblen told him to say "an accounting error had been made," and that "an accountant had made a mistake." App. at 439a. But on cross-examination, Smith conceded that the "accounting error" explanation "may well have come from either Mr. Storm or Mr. Ashfield," App. at 446a, and finally acknowledged that no one other than Storm and Ashfield "would know whether there was an error." App. at 449a.
 
 
 34
 Following this hearing, the trial court found that "basically ... [Giblen's statement] is a position that is going to be taken with the IRS." App. at 453a. More importantly, the judge found that the statement was "not one which Mr. Giblen was necessarily adopting or endorsing or vouching for as being true." App. at 455a. Based on these findings, the court determined that Giblen's statement was not a statement against interest "either of himself or his company." App. at 453a.
 
 
 35
 Rule 804(b)(3) provides that an out-of-court statement by an unavailable witness is admissible if it was
 
 
 36
 at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true.
 
 
 37
 Thus, an essential predicate for applying this rule is that the hearsay be objectively contrary to the declarant's interest. In the case before us, the district court concluded that this prerequisite was lacking. Because, in the court's view, Giblen failed to "adopt[ ] or endors[e] or vouch[ ] for" the explanation, his statement was not objectively contrary to his interest and therefore did not satisfy Rule 804(b)(3)'s threshold requirement.
 
 
 38
 Reviewing this determination under the abuse of discretion standard, we are satisfied that the trial court properly exercised his discretion in excluding the Giblen hearsay. Two factors undergird our conclusion. First, Giblen's comment was so general that it never expressly assumed responsibility by a Giblen & Co. accountant: no accountant was named and no particular error was identified.[5] Second, Giblen made his statement after his firm had begun to act as a representative of Storm and Ashfield in the IRS investigation. In such capacity Giblen seems to have been serving as a conduit for defenses suggested by his clients.
 
 
 39
 The defendants have suggested that the trial judge's exclusion of this hearsay is at odds with his decision to admit another Giblen hearsay statement. Allen Stockelberg, the second-in-command at Giblen & Co., was permitted to testify about Giblen's comments after an evidentiary hearing at which he reported Giblen as saying "we had fouled up." App. at 207a.[6] As we view this statement, it differs substantially from the excluded comments in that it approaches a direct and personal assumption of responsibility by Giblen & Co.'s owner. Certainly the district judge acted within his discretion in admitting this statement while excluding Donald Smith's recollection of Giblen's other comments.
 
 B.
 
 40
 Storm and Ashfield also maintain that the district court erred in refusing to grant a mistrial in order that the law firm representing Storm could withdraw from the case and one of its attorneys could take the stand. The defendants assert that the significance of the lawyer's testimony was not apparent until the government surprised them at trial with unexpected evidence that the lawyer could rebut and that the court's decision not to grant a mistrial effectively deprived them of their right to present a complete defense.
 
 
 41
 The issue arose when, at trial, an IRS special agent testified about a September 1978 meeting with Storm and his attorney, Jerome Miller. Storm was supposed to produce all of NTA's financial records for 1973-75, and, according to the special agent, Storm claimed that he had indeed produced all the documents required by the IRS summons. The IRS later discovered, through NTA's bank, that records for the management trust account were not produced, and this discovery ultimately led to the uncovering of the illegal loan repayments.
 
 
 42
 When the testimony regarding the missing documents was introduced, Storm moved for a mistrial. Storm argued that because Miller's law firm represented him at trial, and because Disciplinary Rules 5-101 and 5-102 of the Model Code of Professional Responsibility (1979) prevented Miller from testifying in a case in which his firm acted as counsel, a mistrial was necessary to permit Storm to retain new counsel and to put Miller on the stand to impeach the special agent's report of the September 1978 meeting. The trial court refused to grant a mistrial, declaring that Storm's attorneys had "fully discharged their obligation" and that they fell under an exception to the rule because they were "now so completely immersed in this case" that they would "surely [provide] the most effective representation." App. at 628a-629a. Despite these assurances from the judge, the defense chose not to call Miller to the stand.
 
 
 43
 The district court's decision not to order a new trial because of this development was proper for two reasons. First, assuming that Storm was indeed surprised at trial by the special agent's testimony, the district court properly invoked an exception to the disciplinary rules. Although ordinarily a lawyer must withdraw from representation of a client when "it is obvious that ... a lawyer in his firm will be called as a witness on behalf of his client," Model Code, supra, DR 5-102(A), the Model Code permits an attorney to continue "[a]s to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in a particular case." Id. at DR 5-101(B). We agree with the district court that in view of the longtime involvement of Miller's law firm, both in the IRS investigation and in the trial preparation, the firm's withdrawal would have worked a "substantial hardship" on Storm.
 
 
 44
 Second, and more importantly, the record demonstrates that the defense had reason to know the September 1978 meeting might be brought up at trial. Far from being a "booby trap"--the term used in Storm's brief--the testimony by the IRS special agent was brought to the defense's attention with adequate time to prepare a response. Well before trial, the government sent the special agent's memorandum of the September 1978 meeting to the defense as part of the Brady production. Once again during pretrial evidentiary rulings, the government moved to introduce Miller's statement during the September 1978 meeting as an adoptive admission of Storm. In light of these early warnings, we believe the government fairly characterizes Miller's failure to testify as a "tactical decision."
 
 
 45
 The defendants argue that they should have been specifically put on notice about the special agent's testimony on three other occasions: (1) when the prosecution moved to disqualify Miller's law firm; (2) when the prosecution moved for admission of a memorandum containing statements by Miller about the document production; and (3) when the prosecution agreed with Storm to stipulate to admission of NTA financial records without calling a document custodian. But this catalog of purported "concealment" by the government simply reaffirms the conclusion that, despite Miller's extensive involvement in the IRS investigation, and despite the innumerable points on which he could have testified, the defense intentionally chose to keep Miller's firm in the case. The September 1978 meeting was anything but an isolated "booby trap"; the prosecution's evidence was replete with such encounters. Having made the decision to use Miller's firm nonetheless, the defense is not persuasive in its contention that we should order a new trial to be conducted by other counsel.
 
 C.
 
 46
 Storm and Ashfield's final claim of trial error arises from a statement by the prosecutor that they insist constitutes a comment on the defendants' failure to take the stand. In his rebuttal summation, the Assistant United States Attorney stated:
 
 
 47
 Sure trust accounts are common in business. There is nothing wrong with having a trust account. It is part and parcel of a business where you have client income. You heard no explanation of the reason why it was necessary to keep such a trust account secret except to avoid payment of taxes.
 
 
 48
 App. at 872a. Defense moved for a mistrial and curative instruction, but the judge ruled that "I didn't find anything offensive" and "I don't feel there is the likelihood of the jury drawing an improper inference." App. at 874a-875a. The judge gave only the standard cautionary instruction about not drawing inferences from a defendant's failure to testify.
 
 
 49
 In the circumstances of this case, we do not believe this comment required a mistrial. The "explanation" for the secrecy could have come from a number of witnesses. Trust accounts were discussed at length during the testimony of several Giblen & Co. accountants and a talent agency employee, and an explanation for the secrecy surrounding NTA's trust account could have been extracted from them if the defense so chose. Thus, when the prosecution asked rhetorically why no explanation was proffered, the question might just as well have referred to persons who took the stand. Since it was far from clear that the prosecutor's statement referred to the defendants, we believe that the judge acted within the scope of his discretion in refusing a mistrial.
 
 IV.
 
 50
 On behalf of Ashfield alone, it is asserted that the district judge erroneously denied a post-verdict motion for a new trial based on the discovery of an accountant's workpaper containing the notation "7500--each officer was withdrawn to personal name from escrow account." According to Ashfield, the discovery of this document required a new trial because the notation proved that NTA's accountants knew of the existence of the management trust account, and therefore supported the claim that the underpayment of taxes resulted from an accounting error. To prevail on a motion for a new trial based on newly discovered evidence, a defendant bears the heavy burden of establishing five requirements: the evidence must be newly discovered; facts must be alleged from which the court may infer diligence on the part of the movant; the evidence must not be merely cumulative or impeaching; it must be material to the issues; and it must be such that, on a new trial, it would probably produce an acquittal. U.S. v. Rocco, 587 F.2d 144, 146 (3d Cir.1978). We have carefully considered the document as well as the record on the basis of this exacting standard. In view of Ashfield's limited showing of diligence and failure to demonstrate that this new evidence would probably produce an acquittal, we are satisfied that the district judge properly exercised his discretion in refusing Ashfield a new trial on the ground of this newly discovered document.
 
 V.
 
 51
 The judgment of conviction against Storm will be affirmed. The judgment of acquittal in favor of Ashfield will be reversed, and Ashfield's case will be remanded to the district court for action consistent with this opinion.
 
 
 
 *
 Hon. Hubert I. Teitelbaum, United States District Court for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 Through this officers' loans account, Storm and Ashfield borrowed from corporate funds to pay for such personal expenses as rent, college tuition, tax bills, and a cemetery plot. App. at 528a-538a
 
 
 [2]
 Specifically, Count 1 of the indictment alleged that Storm "did knowingly and willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States for calendar year 1975 ... [i]n violation of Title 26, United States Code, Section 7201." App. at 19a. Count 2 alleged the same crime by Ashfield. App. at 20a
 
 
 [3]
 The district court's analysis of the record consisted of the following statement:
 I am not going to recite chapter, line and verse of the evidence that bore upon the knowledge, the intent, the guilt, if you will, of Mr. Ashfield. It has been amply explored here by both counsel.
 The Court realizes also that it does not sit as a super jury to retry this case and [sic] if the jury had not rendered its verdict. Whether or not I would reach a different result as the trier of the facts is not the standard, and the [U.S. v.] Gross [, 375 F.Supp. 971 (D.N.J.1974) ] and Curley [v. U.S., 160 F.2d 229 (D.C.Cir.1947) ] test which I have described here makes that clear.
 However, based upon what I consider to be well-reasoned precedent in United States v. Forest [sic], [620 F.2d 446 (5th Cir.1980) ], which I have cited earlier, I determine that giving indeed due regard to all of the functions of the jury here as the triers of the fact and the drawers of legitimate inferences, reasonable minds could not have concluded that all of the elements of the crime charged were established beyond a reasonable doubt as to the defendant Ashfield.
 The record and the evidence which might have served as a source for the jury's verdict in that respect was insufficient to permit the jury's verdict based upon that high standard and burden of proof.
 Accordingly, this Court will enter a judgment of acquittal with regard to the defendant Jerome Ashfield.
 App. at 44a-45a.
 
 
 [4]
 Most of Ashfield's brief is devoted to arguing that the district court correctly granted his motion for acquittal. Ashfield also argues, however, that if we reverse the judgment of acquittal, we should order a new trial because of purported trial errors of the district court. On these issues, Ashfield's brief incorporates the arguments pressed in Storm's brief, except for one claim based on newly discovered evidence. See Part IV, infra
 
 
 [5]
 Indeed, despite all the testimony by accountants, no accounting error was ever identified at trial. Moreover, the Giblen & Co. accountant who actually worked on NTA's books during 1973-75, Maurice Fleinblatt, told Smith that no error was made. App. at 447a
 
 
 [6]
 Before the jury, however, Stockelberg testified that Giblen had said the loan repayments "should have been handled differently." App. at 365a