*837 OPINION OF THE COURT
ACKERMAN, Senior District Judge.
Defendani/Appellant Daniel Rutherford appeals his conviction under the Hobbs Act, 18 U.S.C. § 1951. The Hobbs Act makes robbery a federal crime where the robbery affects interstate commerce. Because the Government presented sufficient evidence for a reasonable jury to conclude that Rutherford’s robberies affected interstate commerce, we will affirm.
I.
On July 7, 2003 and again four days later on July 11, Defendant Daniel Rutherford robbed the DePativo Chiropractor Center (“DCC”) at 6100 Spruce Street in Philadelphia. DCC was operated by Drs. Carl and Anthony DiPativo, father and son. At the time of the robberies, DCC had three offices: 6100 Spruce Street in Philadelphia (“Spruce Street office”), another on North Broad Street in Philadelphia (“North Broad Street office”), and one on West White Horse Pike in Berlin, New Jersey (“New Jersey office”). The Spruce Street office was on the ground floor of a residential apartment building. The two chiropractors worked at the offices along with- various receptionists and nurses. Each chiropractor often worked in more than one office per day. Among its services, DCC provided its patients with cervical collars and pillows, back supports, rib braces, neck braces, and cold packs. DCC purchased most of these items from Plymouth Bell Laboratories in Pennsylvania, which in turn purchased the goods from manufacturers around the country. DCC also obtained some medical items directly from out-of-state providers. The supplies for both Philadelphia offices were shipped to the North Broad Street office.
Rutherford’s first robbery of the Spruce Street office occurred at approximately 1:30 p.m. on July 7, while the office was open and treating patients. Rutherford entered DCC and pretended to be a potential patient. After sending an elderly patient into a treatment room, Dr. Carl De-Pativo spoke to Rutherford. Rutherford drew a handgun, pointed it at the doctor, and demanded money. Rutherford then forced Dr. Carl DePativo into a rear office, closed the door, and demanded a watch from the doctor’s desk. The doctor gave Rutherford the cash from his pocket— approximately $390 — and the watch. After ordering the doctor to stay in the room until he was gone, Rutherford left the office. The doctor then informed the police.
The second robbery, on July 11, 2003, took place at approximately 4:00 p.m. at the Spruce Street office. Rutherford was accompanied by Elijah Smith. Dr. Anthony DePativo was on duty, along with receptionist/medical assistant Leida Perez. Rutherford and Smith pretended to be potential patients. Smith asked for water, and Rutherford asked if the doctor was available. Perez answered that he was, and Rutherford identified himself to her as a new patient named Mike Westcott. When Perez turned away, Rutherford walked into Dr. Anthony DePativo’s office, drew a gun on him, and demanded money. Smith remained in the reception area, drew a gun on Perez, grabbed her by the arm, and forced her into Dr. Anthony De-Pativo’s office. The two robbers demanded money and drugs, but were told that there were no drugs in the office. Rutherford searched the drawers in the office for drugs, but found none. Rutherford then demanded the money from the doctor’s pockets. Rutherford and Smith stole $10 from the doctor and $5 from Perez, as well as jewelry from both victims, the doctor’s credit card, and Perez’s duffle bag, which contained her wallet, cell phone, and identification. The total value of the stolen cash and items was approximately $900. *838 The robbers ordered the doctor and Perez to remain in the rear office while they fled, and before leaving, the robbers pulled the office phone wires out of the wall.
On the evening of the second robbery, Dr. Anthony DePativo cancelled his appointments for patients he had scheduled to see in the New Jersey office that evening, and reported the robbery to the police. No evidence at trial suggested that the patient appointments were not successfully rescheduled, i.e. no evidence indicated that patient hours or income were lost.
After these two armed robberies in four days in July 2003, the doctors and staff became frightened. According to testimony by Dr. Carl DePativo, DCC cancelled all of its patient appointments at the Spruce Street office “[t]he week after” the robberies and had a new security door system installed. (J.A. 87.) No testimony suggested that these appointments were not rescheduled or that any patient hours were ultimately lost. Approximately eight months later, in March 2004, DCC closed the Spruce Street office, apparently because the doctors and staff were still too frightened to continue working at that location. Dr. Carl DePativo testified that “nobody wanted to work” in the office because employees were “all ... skittish about what had happened.” (J.A. 88.) The North Broad Street and New Jersey offices remain open. No testimony at trial suggested that DCC’s use of medical supplies manufactured out-of-state declined from the time of the robbery until the closing of the Spruce Street office.
On March 8, 2005, a grand jury in the Eastern District of Pennsylvania returned an indictment against Rutherford, charging him with: two counts of interference with interstate commerce by robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951(a); one count of conspiracy to interfere with interstate commerce by robbery, in violation of the Hobbs Act and 18 U.S.C. § 2; and two counts of knowingly using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).
Rutherford pled not guilty. After a two-day trial, the jury returned a guilty verdict on all counts in September 2005. On January 30, 2006, the District Court sentenced Rutherford to 509 months’ imprisonment: 125 months on the robbery counts and 384 months on the firearm counts, to run consecutively. The court also sentenced Rutherford to five years’ supervised release and imposed restitution of $1,290. Rutherford filed a timely appeal with this Court. Rutherford only appeals his conviction and does not appeal his sentence.
II.
Rutherford argues that there was insufficient evidence presented at trial to support the jury’s guilty verdict under the Hobbs Act. While this Court’s review of a challenge to the sufficiency of the evidence is plenary, United States v. Mussare, 405 F.3d 161, 166 (3d Cir.2005), such an argument places a “very heavy burden on an appellant” because we employ “a particularly deferential standard of review when deciding whether a jury verdict rests on legally sufficient evidence,” United States v. Dent, 149 F.3d 180, 187 (3d Cir.1998). Accordingly, when reviewing a jury verdict for insufficient evidence, we do not weigh the evidence or determine the credibility of the witnesses, but will “view the evidence in the light most favorable to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (quoting United States v. Voigt, 89 F.3d 1050, 1080 (3d Cir.1996) (citation and internal quotation marks omitted)). Only if no rational jury could have found the essential elements of a crime beyond a reasonable doubt can we *839 vacate a jury’s verdict. See Jackson v. Virginia, 448 U.S. 807, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Mussare, 405 F.3d at 166. “Our task is not to decide what we would conclude had we been the finders of fact; instead, we are limited to determining whether the conclusion chosen by the factfinders was permissible.” United States v. Ashfield, 735 F.2d 101, 106 (3d Cir.1984).
Rutherford also appeals the District Court’s denial of his motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. As with review of the jury verdict for insufficient evidence, our review of a motion for judgment of acquittal “is plenary and, in exercising that review, we must interpret the evidence in the light most favorable to the government as the verdict winner.” United States v. Taftsiou, 144 F.3d 287, 290 (3d Cir.1998).
The Hobbs Act makes robbery a federal crime where the defendant “in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce.” 18 U.S.C. § 1951(a). “The question of whether a defendant’s acts satisfy the jurisdictional predicate of the Hobbs Act is one of law,” United States v. Buffey, 899 F.2d 1402, 1407 (4th Cir.1990), and “[t]he charge that interstate commerce is affected is critical since the Federal Government’s jurisdiction of this crime rests only on that interference,” Stirone v. United States, 361 U.S. 212, 218, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). However, the burden on the Government is very low. If the robbery “produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential, it is sufficient to uphold a prosecution” under the Hobbs Act. United States v. Haywood, 363 F.3d 200, 210 (3d Cir.2004) (quoting Jund v. Town of Hempstead, 941 F.2d 1271, 1285 (2d Cir.1991)). The Hobbs Act “speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.” Stirone, 361 U.S. at 215, 80 S.Ct. 270.
The Government contends that the interstate commerce requirement of the Hobbs Act was met here by the following evidence: 1) DCC was an open and active business engaging in and affecting interstate commerce at the time of the robberies; 2) DCC used medical items that traveled in interstate commerce; 3) after the second robbery, Dr. Anthony DePativo cancelled patient appointments at the New Jersey office because the doctor was at the police station; 4) the week following the robberies, DCC closed the Spruce Street office for a day to install a new security door; and 5) approximately eight months later, DCC closed the Spruce Street office because “they just weren’t willing to work there anymore because of the fear that these robberies began.” (J.A. 462).
Rutherford claims on appeal that the Government did not offer sufficient proof of the interstate commerce nexus to sup-port his conviction under the Hobbs Act. He stresses that no money or property of the DCC business was stolen in the two robberies; rather, only personal property and personal cash were stolen from the Drs. DePativo and Ms. Perez. He also notes that the Government presented no evidence that DCC lost any patients or patient hours, or purchased fewer supplies from out-of-state manufacturers after the robberies. Rutherford argues that installation of the new security door and eventual closing of the Spruce Street office should not be considered as effects of the robberies, as these events were too remote in time and were future-oriented, preventative measures. Such measures “to try to enhance their security” “might just as well have been taken if [the DePativos] had *840 been mugged in the street, or if one of the residential tenants in their building had been similarly robbed.” (Rutherford Br. at 9-10.)
III.
At first blush, one could reasonably question, under our federalist system, whether an otherwise “garden-variety” armed robbery of individuals in a chiropractic office could constitute a federal crime. Indeed, Rutherford’s argument on appeal boils down to the contention that the “offenses here were of a quintessentially local variety and as such they were for the [Commonwealth] of Pennsylvania to prosecute, not the federal government.” (Rutherford Br. at 10, 13.) As we discuss below, prosecution of these crimes by the Commonwealth of Pennsylvania might have been a more prudent course of action. However, federal courts — including our Court — have repeatedly and almost uniformly construed the Hobbs Act’s interstate commerce requirement extremely broadly. We have required only a “potential” or “de minimis ” effect on interstate commerce to support a Hobbs Act conviction. See, e.g., United States v. Urban, 404 F.3d 754, 766 (3d Cir.2005); Haywood, 363 F.3d at 209-10; United States v. Clausen, 328 F.3d 708, 711 (3d Cir.2003).
Urban involved extortion by Philadelphia plumbing inspectors and specifically considered the “depletion of assets” theory, “whereby proof that a Hobbs Act violation depletes the assets of a business engaged in interstate commerce conclusively establishes the effect on commerce requirement.” Urban, 404 F.3d at 762. In upholding the convictions in Urban, we discussed our consistent and repeated endorsements of the depletion of assets theory, and more generally the rule that proof of merely a potential effect on commerce is all that is needed under the Hobbs Act. Id. at 763-67.[1] Based on our review of extensive Third Circuit precedent in Urban, we reiterated that all that is required under the Hobbs Act is a “reasonably probable effect on commerce, however minimal.” Urban, 404 F.3d at 763-64 (quoting United States v. Cerilli, 603 F.2d 415, 424 (3d Cir.1979)); see also Urban, 404 F.3d at 763 (“[T]he Hobbs Act may constitutionally be construed to reach the indirect burdens placed on interstate commerce by the extortionate activities alleged in this case and that such a construction of the statute accords with Congressional intent to proscribe extortion which ‘in any way or degree obstructs, delays, or affects commerce.’” (quoting United States v. Mazzei 521 F.2d 639, 642 (3d Cir.1975) (en banc))). As we noted in Urban, the overwhelming weight of authority from our sister circuits supports the “potential effect,” de minimis reading of the Hobbs Act. Urban, 404 F.3d at 765 n. 3.
Rutherford first argues that, as a constitutional matter, the Supreme Court’s opinion in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), dictates that, even under a de minimis standard, this Court should not allow the Government to “to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the states.” (Rutherford Br. at 14 (citing Lopez, 514 U.S. at 567, 115 S.Ct. 1624).) The defendant in Urban raised the same theory, contending that Lopez and its progeny— United States v. Morrison, 529 U.S. 598, *841 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), and Jones v. United States, 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000)[2] — cast constitutional doubt on the “potential effect” reading of the Hobbs Act and requires a finding of an “actual effect.” Urban, 404 F.3d at 766. The Urban court rejected this argument, as did our earlier opinion in Clausen. Clausen held that the Hobbs Act “regulate[s] activity which occurs locally but which has an explicit nexus with interstate commerce, and [is] therefore distinguishable from the statutes at issue in Lopez and Morrison.” Clausen, 328 F.3d at 711. In Clausen, “we followed the lead of other circuits, including the Fifth Circuit, which had held that after Lopez, ‘legislation concerning an intrastate activity will be upheld if Congress could rationally have concluded that the activity, in isolation or in the aggregate, substantially affects interstate commerce.’ ” Urban, 404 F.3d at 766 (citing United States v. Robinson, 119 F.3d 1205, 1211 (5th Cir. 1997)). Clausen and Urban endorsed the view of the Fifth Circuit in Robinson that “ ‘the cumulative result of many Hobbs Act violations is a substantial effect upon interstate commerce,’ and that substantial effect empowers Congress to regulate pursuant to the Commerce Clause.” Clausen, 328 F.3d at 711 (quoting Robinson, 119 F.3d at 1215); see also Urban, 404 F.3d at 766. Thus, we reject Rutherford’s argument that Lopez and its progeny invalidate his conviction under the Hobbs Act.
Turning to the statutory standard, Rutherford primarily argues that even under the de minimis, potential effects test, “the effect still must be more than a speculative, attenuated ‘one step removed’ kind of effect.” United States v. Mattson, 671 F.2d 1020, 1023 (7th Cir.1982). He contends that the effects cited by the Government were too attenuated in time and cause from the robberies to qualify as effects, whether actual or potential, of the robberies, and that the robberies should at least be analogized to robberies of an individual on the street rather than robberies of a business.
With regard to the latter theory, courts have indeed been hesitant to find the requisite interstate commerce nexus in cases involving robberies of individuals that have some connection with interstate commerce, and especially involving robberies of individuals in the home. See United States v. Jimenez-Torres, 435 F.3d 3, 7-8 (1st Cir. 2006) (“Where ... the crime concerns the robbery of a home rather than of a business, we approach the task of applying the de minimis standard with some caution, lest every robbery (which by definition has some economic component) become a federal crime.”); see also, e.g., United States v. Perrotta, 313 F.3d 33, 36-40 (2d Cir. 2002); United States v. Turner, 272 F.3d 380, 384-85 (6th Cir.2001). Rutherford indicates that his reliance on cases such as these “is not to suggest that [his] argument is dependant upon the characterization of this case as a robbery of an individual rather than a business.” (Rutherford Br. at 16 n. 6.)
Despite this disclaimer, his argument boils down to just such an inapt characterization. Rutherford stresses that he and his accomplice only stole personal cash and assets of employees at DCC, and no evidence suggests that property of the business was taken. He therefore contends that the DePativos “might well have” decided to take their subsequent actions— cancelling patient appointments, installing *842 a new security door at the Spruce Street office, and eventually closing the Spruce Street office — “if they had been mugged outside of their office or if one of the residential tenants in their building had been robbed.” (Rutherford Br. at 19.) If indeed this were the case, Rutherford might have a colorable argument that the effect on interstate commerce of the robberies of personal property was too attenuated. But these robberies took place in the office of a business engaged in interstate commerce. Rutherford’s Hobbs Act convictions depended not just on the fact that the victims worked for a business engaged in interstate commerce, but also on the crucial facts that the robberies occurred in the place of business during business hours, and that Rutherford posed as a patient — a customer — of the business.
Rutherford’s argument is akin to that rejected by the First Circuit in United States v. Vega Molina, 407 F.3d 511, 527 (1st Cir.2005). The defendants in Vega Molina robbed employees in a business office engaged in interstate commerce, and argued on appeal that the “government failed to prove any effect on commerce because the perpetrators only took money from [the office’s] employees, not from the business itself.” Id. The First Circuit dismissed defendant’s argument as “specious” and declared that “[i]t conveniently overlooks the profound effect” that defendant’s robbery had on the victim’s office. Id. It reasoned that “[t]he commission of a violent crime in the workplace inevitably will constitute a wrenching, if unquantifiable, blow to morale and productivity.” Id. (holding that robbery at business, coupled with business closing the office the next day, constituted “more than adequate” evidence “to demonstrate at least a de minim-is effect on commerce”).
The same reasoning applies here. Rutherford’s robberies had a clear effect on morale and productivity at DCC, as demonstrated by the DePativos’ trial testimony, the installation of a new security door, and the subsequent closing of the office. Rutherford relies on the notion that the Government failed to offer any proof that the robberies resulted in any depletion of assets, reduction in purchases of interstate supplies, or loss of patient hours. However, even though the can-celled patient appointments apparently were rescheduled, these cancellations constitute, at minimum, a potential effect on interstate commerce and an obstruction of interstate commerce. The Hobbs Act requires no more. Based on the facts of this case, for the Government to meet its burden, it simply did not need to present proof that DCC suffered any actual loss of patient hours or other depletion of assets.
In addition, Rutherford attempted to steal drugs from the doctors’ offices; this attempt constituted a potential effect on interstate commerce in that Rutherford sought to steal business property and thereby disrupt commerce. In Perrotta, the Second Circuit outlined several instances “where a robbery or extortion of an employee of a business engaged in interstate commerce would likely support Hobbs Act jurisdiction.” 313 F.3d at 37. One such instance is where “the crime targeted the assets of a business rather than an individual.” Id. at 38. Here, Rutherford targeted in part the business assets of DCC, and searched some part of the office for drugs, even if he only succeeded in stealing the personal assets of DCC’s employees.
Rutherford further contends that DCC’s installation of a new security door approximately one week after the robberies was not an effect of the robbery because the old door was not damaged in the robbery, and was installed as an attempt “to ensure that no additional robberies would occur in the future.” (Rutherford Br. at 18.) It *843 goes too far on Rutherford’s part to depict the installation of the new security door as merely a “discretionary security measure” (Rutherford Reply Br. at 3 n. 1) rather than a response to and effect of the robbery. The door was installed as a direct response to the robbery and its installation at least potentially affected interstate commerce by forcing the cancellation of patient appointments. Rutherford claims that if the “discretionary security measure” here provided a sufficient basis for federal jurisdiction, then “the Act would apply to virtually any street mugging so long as any businesses in the area reacted to the crime by purchasing some type of additional security.” (Rutherford Reply Br. at 3.) Maybe so, and perhaps under Rutherford’s alternative scenario the Hobbs Act might be stretched too far. But again, such a case is not us. DCC did not install the new security door in response to a mugging down the street; rather, the door was installed to assuage fears at the victimized office resulting from a robbery in the office just one week prior. Rutherford accuses the Government of applying an “Alice in Wonderland” approach and “hypothesiz[ing] a different robbery than the one that actually occurred.” (Rutherford Reply Br. 7.) Yet the Government may indeed rely on “potential” effects. Rutherford, on the other hand, repeatedly “hypothesizes a different robbery” than the two he committed, and his reading of the “effects” of his robberies is too narrow under the law of this and other Circuits.
Finally, Rutherford challenges the sufficiency of proof of the interstate commerce nexus by focusing on the length of time between the robberies and the closing of the Spruce Street office. He relies on Perrotta, in which the Second Circuit suggested that, in assessing jurisdiction under the Hobbs Act, a court should examine the “time frame charged in the indictment.” Perrotta, 313 F.3d at 3SM0.[3] Here, the Indictment against Rutherford only charges the robberies on July 7 and 11, 2003, and does not expressly charge a time period that includes March 2004, when DCC closed the Spruce Street office. We recognize that, generally, there must be some outer temporal limit of relevance in a Hobbs Act case. However, based on the Supreme Court’s and our Court’s broad reading of the Hobbs Act, a jury may appropriately determine whether a certain act was an effect of the robbery on a case-by-case basis. Here, trial testimony clearly established that the DePativos closed the Spruce Street office due to the continued fear and unease of employees and patients at the office in the months following the robberies. As Dr. Carl DePativo testified, “nobody” wanted to work in the office because they were “skittish about what had happened.” (J.A. 88.) The elos *844 ing of the office, coupled with the earlier effects of the robberies — both actual and potential — rise to the level of a de minimis effect on interstate commerce sufficient to sustain a conviction under the Hobbs Act. Based on the circumstances surrounding the closing of the office, combined with the other evidence presented, a reasonable jury could find that the Hobbs Act’s interstate commerce requirement was met.[4]
IV.
At oral argument, counsel for the Government represented that this case was prosecuted in federal court because of information received from Elijah Smith, Rutherford’s accomplice in the second robbery, and Saeed Washington, Rutherford’s friend who worked at times for DCC. Smith and Washington pled guilty to a series of federal crimes unrelated to the offenses before us, and during the course of their cooperation with the United States Attorney’s Office for the Eastern District of Pennsylvania provided information about Rutherford and the DCC robberies.
As discussed above, sufficient evidence supported Rutherford’s conviction under the Hobbs Act. However, the prosecution of Rutherford in federal court for these robberies nonetheless implicates federalism concerns of fundamental importance. “[T]he Hobbs Act was intended to reach only certain activities that hamper interstate business, reflecting the long-recognized principle that the states are best positioned and equipped to enforce the general criminal laws.” United States v. Collins, 40 F.3d 95, 101 (5th Cir.1994). In our federalist system, the Pennsylvania state government might have been “best positioned and equipped” to prosecute Rutherford here. The federal authorities might have been the first, with the assistance of the cooperating federal defendants, to procure information crucial to prosecuting Rutherford, but this alone should not have prevented informing Pennsylvania authorities of this information and allowing the Commonwealth to handle this case. While there was sufficient evidence here to support conviction under the Hobbs Act based on the de minimis interstate commerce requirement, the federal government might better focus its resources and unique expertise on truly “federal” matters and, where possible, leave enforcement of general criminal laws to the states.
V.
The Government offered sufficient proof that Rutherford’s robberies affected interstate commerce such that federal jurisdiction and conviction under the Hobbs Act were proper. A rational jury could easily find that his robberies had at least a de minimis, potential effect on interstate commerce. Rutherford’s convictions under § 924(c) for carrying a firearm in connection with a crime of violence also depend on his robberies being federal crimes. We will affirm Rutherford’s convictions in their entirety.

. At oral argument, we asked counsel for Rutherford if he had cited Urban in his briefs, and if not, why. Counsel responded that "we do cite Urban in our reply brief." After a close review of both Rutherford’s initial and reply briefs, we could not locate any citation to, let alone discussion of, Urban. We suggest that counsel be more careful in the future.

. It should be noted that Jones, while addressing Congress’s authority under the Commerce Clause, ultimately avoided the constitutional question and held that the statute under review did not reach to the fullest extent of Congress’s commerce power. Jones, 529 U.S. at 856-58, 120 S.Ct. 1904.

. In Perrotta, the Second Circuit declined to rely on evidence that the private dispute between the victim and the defendant affected the business where both worked because the alleged effects on the business occurred outside the range of time charged in the indictment. Perrotta, 313 F.3d at 38-39. However, Perrotta’s discussion of time frame is distinguishable here. Perrotta considered an appeal from the retrial of the defendant. For the second trial, the Government redrafted and narrowed the indictment against the defendant in part to preclude evidence of a prior business dispute between the defendant and the target of his extortion, apparently to avoid the jury having "sympathy for defendant and dislike for the victim.” Id. at 39. "At every opportunity, the government used the narrowed indictment to support evidentiary objections to events outside the time frame charged.” Id. Because the Government based its Hobbs Act prosecution on effects related to the business dispute and that occurred "well outside” the time frame charged in the indictment, id., the Second Circuit refused to allow the Government, colloquially speaking, to "have its cake and eat it too.” Clearly, such concerns are absent in our case.

. Rutherford argues that the District Court should not have admitted evidence regarding the new security door and closing of the Spruce Street office because they were too distant in time from the robberies and therefore not relevant to proving the requisite effect on interstate commerce. We review the District Court’s admission of evidence for abuse of discretion. United States v. Frazier, 469 F.3d 85, 87 (3d Cir.2006). Because the subsequent activities were effects of the robberies and relevant to the Hobbs Act inquiry, the District Court did not err in admitting such evidence.