**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3090
_____

UNITED STATES OF AMERICA

v.

BARRON WALKER,
                            Appellant
_____

No. 10-3210
_____

UNITED STATES OF AMERICA

v.

BARRY WALKER,
                            Appellant
_____


On Appeal from the United States District Court
For the Middle District of Pennsylvania
(D.C. Criminal Action No. 07-00263)
District Judge:  Honorable Yvette Kane

_____

Argued April 26, 2011
_____

Before:  SLOVITER and GREENAWAY, JR., <u>Circuit</u>
<u>Judges</u>, and POLLAK, <u>District Judge</u>[*]

(Opinion filed:  September 13, 2011)

James J. West, Esq. (Argued)
105 North Front Street
Suite 205
Harrisburg, PA  17101

    *Counsel for Appellant Barron Walker*

Jason B. Duncan, Esq. (Argued)
Stone, Duncan & Associates
8 North Baltimore Street
Dillsburg, PA  17019

    *Counsel for Appellant Barry Walker*

Michael A. Consiglio, Esq. (Argued)
Eric Pfisterer, Esq.
Office of the United States Attorney
228 Walnut St., P.O. Box 11754

_____

[*] Honorable Louis H. Pollak, Senior Judge of the United
States District Court for the Eastern District of Pennsylvania,
sitting by designation.

220 Federal Building and Courthouse
Harrisburg, PA  17108

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

POLLAK, <u>District Judge</u>.

This consolidated criminal appeal arises from the conviction, in August 2008, of two brothers, Barron Walker and Barry Walker, for various federal drug trafficking, firearm, and robbery charges.  The Walker brothers were each sentenced to prison terms of 47 ½ years.  They now appeal their convictions on several grounds.

## I.      Background

### A.      <u>Indictment and Pre-Trial Motions</u>

On June 27, 2007, defendants Barron Walker and Barry Walker were each charged in a four-count indictment for possession of cocaine base, in violation of 21 U.S.C. § 841(a)(1)) (Count I); criminal conspiracy, in violation of 21 U.S.C. § 846 (Count II); possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c) (Count III); and possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g) (Count IV).  The indictment alleged that these crimes occurred in Harrisburg, Pennsylvania, during the weeks before May 31, 2007.

In a series of superseding indictments, the government filed several additional charges against the Walkers.[1] Ultimately, both Walkers were charged with attempted robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951(a) (Count VI), and with using a firearm in furtherance of the robbery, in violation of 18 U.S.C. § 924(c) (Count V), for their involvement in the attempted robbery of a crack cocaine dealer at gunpoint on May 31, 2007. Barry Walker, who was ordered detained by the federal magistrate judge following the attempted robbery, was also charged with escaping from custody on July 10, 2007, in violation of 18 U.S.C. § 751(a) (Count VII). When Barry Walker was re-arrested two days later while sitting in a car, the arresting officers recovered crack cocaine from his person and the car's passenger admitted that Walker entered the vehicle to sell him crack cocaine. As a result, Barry Walker was charged with an additional count of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a) (Count VIII).

On August 20, 2007, defendant Barron Walker filed a motion to sever for misjoinder based upon the escape charge and the additional drug charge against his brother Barry. The motion argued that joinder was improper under Federal Rule of Criminal Procedure 8(b), and also argued, in the alternative, that even if joinder were proper, the district court should sever the trials pursuant to Federal Rule of Criminal Procedure 14 to prevent prejudice to Barron. The district court denied the motion on May 30, 2008, finding that joinder was proper because "the events of May 31, 2007, in which

---

[1] The final superseding indictment also contained three charges against Jason McNeil, who subsequently pled guilty and testified against the Walker brothers at their trial.

4

both Barron and Barry are alleged to have participated, are properly seen as a logical predicate to Barry's alleged escape, and the escape, in turn, the culminating act 'in the same series of acts.'" With respect to prejudice, the court held that the jury would be able to "compartmentalize the evidence that Barry allegedly escaped custody, and give each defendant his due." The court also promised to instruct the jury to give separate consideration to each charge against each defendant, and later gave such an instruction at trial. Barron Walker renewed the motion to sever at trial, and the court denied it for the same reasons.

On August 6, 2008, five days before trial, the government disclosed to defense counsel its intention to prove the interstate commerce prong of the Hobbs Act robbery charge through the testimony of Chief John Goshert of the Dauphin County Criminal Investigation Division, a thirty-year veteran of cocaine trafficking investigations in Harrisburg and the region. The Walkers objected to the testimony based on the timing of the government's notice of its intent to call Goshert as an expert. The District Court rejected this argument on the ground that the Walkers had not requested expert notification pursuant to Rule 16 of the Federal Rules of Criminal Procedure. The Walkers also objected to Chief Goshert's testimony regarding the interstate transportation of cocaine on the ground that it is possible to manufacture cocaine synthetically. The District Court rejected this argument and permitted Chief Goshert to testify as an expert that in his experience cocaine is manufactured outside of Pennsylvania.

B.    Jury Trial

5

A joint jury trial for both Walker brothers was held from August 11 to August 14, 2008.[2] To prove the charges that the Walkers were engaged in drug trafficking, conspiracy, and possession of a firearm in furtherance of drug trafficking during the weeks before May 31, 2007 (Counts I, II, and III), the government presented testimony from several witnesses, including (1) Jason McNeil, who pled guilty to participating in the Hobbs Act robbery with the Walkers; (2) Carmillia King, Barry Walker's girlfriend; and (3) Skylar Rhoades, a confidential informant.

Only McNeil and Rhoades presented testimony supporting the charge of possession of a firearm in furtherance of drug trafficking in the weeks before May 31, 2007 (Count III). First, McNeil testified that the Walkers were crack cocaine dealers, and that he had ridden along with them as they drove through Harrisburg and made five to ten sales to crack cocaine customers. He also testified that one of the Walkers possessed a firearm during these deliveries. While he believed that Barron Walker possessed the firearm, he admitted that he was not "positive" which brother possessed it.

Second, Skylar Rhoades, the confidential informant, testified that about two or three weeks before the May 31, 2007 robbery, he was with Jason McNeil's brother, John McNeil, when John purchased crack cocaine from Barron and Barry Walker. According to Rhoades, when the Walkers arrived at the meeting place and got out of their vehicle, he

---

[2] In the following paragraphs, we summarize only the evidence presented at trial relevant to the disposition of this appeal.

6

saw crack in the possession of Barron Walker.  He also saw Barry Walker deliver crack cocaine to John McNeil, and observed a pistol on Barry Walker's hip.  During cross-examination, the defense extensively questioned Rhoades concerning his motives to cooperate with the government and the veracity of his testimony.  At the close of trial, the District Court gave a constructive possession instruction to the jury for the gun possession charge.

To prove the Hobbs Act attempted robbery charge (Count VI) and the use of a firearm in furtherance of a crime of violence charge (Count V), the government presented evidence[3] that on May 31, 2007, the Walkers, along with three friends—Jason McNeil, John McNeil, and James Leeks—agreed to find street-level drug traffickers to rob of their drugs and money.  During the planning of the robbery, the Walkers supplied a firearm to Jason McNeil to be used during the robbery.  The robbers then assembled in an alleyway and watched Edward Wright, a crack cocaine dealer, make a sale to a customer.  John McNeil approached Wright with his gun drawn and attempted to rob him, but Wright took out his own firearm and fired.  John and his companions then opened fire on Wright.  John and Wright were both hit multiple times by gun shots; Wright survived, but John died at the scene.

---

[3] In support of these charges, the government presented testimony from the target of the robbery, Edward Wright; two participants in the robbery, James Leaks and Jason McNeil; investigating law enforcement officers; several background witnesses, and the confidential informant Skylar Rhoades.

To satisfy the Hobbs Act's requirement that the defendants' conduct "obstruct[ed], delay[ed] or affect[ed] commerce," *see* 18 U.S.C. § 1951(a), the government presented testimony from two witnesses. The first witness was the robbery victim, Edward Wright. Wright, who was 17-years-old at the time of the robbery, testified at trial that he was only on the street for five minutes and had completed his very first drug sale. He also testified that he obtained his crack cocaine for $60 from someone with the street name "Ice" whom he met outside a bar a day or two before, and that he made about $40 or $50 by selling the cocaine he obtained from Ice. Wright also didn't know anything about Ice, including whether Ice lived in Harrisburg, and never saw him before or after the purchase. In addition, Wright testified that the Walkers and their accomplices did not succeed in actually taking his crack cocaine, money, or gun from him.

The second witness was Chief John Goshert, the government's expert on the interstate aspects of cocaine trafficking. At trial, Goshert testified that, during his thirty years in the drug investigation field, he was involved with approximately 100 cocaine investigations a month, spoke with drug traffickers on a daily basis, and regularly participated in investigations involving the importation of cocaine into the Harrisburg area. Goshert rendered the expert opinion that cocaine is manufactured outside of Pennsylvania and transported into the state. Goshert identified New York City as the primary source for cocaine in the Harrisburg area. He also testified that in his thirty years of experience, he had never heard of synthetic cocaine being manufactured inside Pennsylvania.

At the conclusion of the trial, the jury returned a verdict finding both defendants guilty of distributing crack

8

cocaine (Count I), conspiring to distribute crack cocaine (Count II), possessing a firearm in furtherance of the distribution of crack cocaine (Count III), Hobbs Act robbery (Count VI), and possessing of a firearm in furtherance of a Hobbs Act robbery (Count V). The jury also found Barry Walker guilty on the two counts arising from his escape (Counts VII–VIII).[4]

### C. Motion for a New Trial and Sentencing

A few weeks after trial, Assistant United States Attorney Michael Consiglio, who had tried the case, wrote to defense counsel to notify them of the following: On March 8, 2007, while Rhoades was working with the ATF as a confidential informant on an unrelated case, agents met with Rhoades for the purpose of arranging a purchase of crack cocaine from a target in quantities of an ounce (28 grams) or larger. When Rhoades arrived, the officers asked Rhoades to change coats because the coat he was wearing would interfere with audio recording they planned to conduct. One of the agents retrieved a coat from the back of Rhoades' car and searched the pockets. One of the pockets contained flakes of marijuana and two loose rocks of cocaine base weighing 0.18 grams. Rhoades told the officers that the jacket was his, but that the substances were old and that he did not know that they were in the jacket.

Rhoades was not charged with any crimes for this

---

[4] The prosecutor voluntarily dismissed Count IV, which charged the Walkers with possession of a firearm after being convicted of a crime punishable by more than one year imprisonment.

incident, and the agents properly notified Consiglio at the time, but Consiglio failed to remember the incident until after the trial of this case. Upon being notified of this incident by Consiglio, the defendants promptly filed a motion for a new trial alleging that impeaching *Brady* material relating to an important government witness was improperly withheld. The District Court denied the motion for a new trial on the ground that the defendants already effectively cross-examined Rhoades at trial, making it unlikely that the jury would reach a different result if the material had been handed over.

Thereafter, the District Court sentenced Barron Walker to a term of 47 ½ years, consisting of 210 months on Counts I, II, and VI to be served concurrently, a 60 month mandatory minimum consecutive term on Count III (the first gun charge) and a 300 month mandatory minimum consecutive term on Count V (the second gun charge). The District Court also sentenced Barry Walker to a term of 47 ½ years, consisting of 210 months on Counts I, II, VI, VII, and VIII to be served concurrently, and 60 month and 300 month consecutive terms for Counts III and V.

The Walkers now appeal on five principal grounds.[5] First, Barron Walker argues that the District Court should have granted his motion to sever because of the two additional escape and drug charges against his brother Barry. Second, both Walkers argue that there was insufficient evidence to support their convictions for use of a firearm in furtherance of drug distribution in the weeks before May 31,

---

[5] The District Court had jurisdiction over this criminal case under 18 U.S.C. § 3231, and we have jurisdiction over this appeal pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

10

2007 (Count III).  Third, the defendants argue that the District Court erred by permitting the government's drug trafficking expert, Chief Goshert, to testify.  Fourth, the defendants argue that there was insufficient evidence of an effect upon interstate commerce to support their convictions under the Hobbs Act (Count VI).  Fifth, the defendants argue that the District Court should have granted their motion for a new trial in light of the fact that the prosecution withheld impeaching *Brady* material concerning the confidential informant Skylar Rhoades.

## II.    Severance

As noted above, while six of the eight charges in the final superseding indictment were made against both Walker brothers, the indictment charged Barry Walker alone with escaping from custody on July 10, 2007 (Count VII), and with possession with intent to distribute cocaine base on the date of his re-arrest (Count VIII).  In this appeal, Barron Walker argues that the District Court erred in denying his motions to sever pursuant to Federal Rules of Criminal Procedure 8(b) and 14, which were based upon these charges against his brother.

### A.    Rule 8(b)

Rule 8(b) governs the joinder of defendants in federal criminal cases.[6]  "The appeal of a denial of a Rule 8 motion

---

[6] In full, Rule 8(b) states that:

11

[for improper joinder] is a claim of legal error, which we review *de novo*." *United States v. Jimenez*, 513 F.3d 62, 82 (3d Cir. 2008) (citing *United States v. Eufrasio,* 935 F.2d 553, 567 (3d Cir. 1991)). The "inquiry into whether . . . defendants were properly joined focuses upon the indictment, not upon the proof that was subsequently produced at trial." *United States v. Irizarry*, 341 F.3d 273, 287 (3d Cir. 2003) (citation omitted). In construing this rule, this court has followed the Supreme Court in recognizing the "fundamental principle that the federal system prefers 'joint trials of defendants who are indicted together [ ]' because joint trials 'promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005)

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Rule 8(a) provides:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

12

(quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (alteration in original)).

Rule 8(b) is "less permissive" than Rule (8)(a), which governs the joinder of counts against a single defendant. *Eufrasio*, 935 F.2d at 570. We note, as a threshold matter, that much as in *Irizarry*, Walker's "focus on Rule 8(b) at first appears misguided because Rule 8(b) authorizes joinder of *defendants* and [Walker] is actually challenging the joinder of allegedly unrelated *offenses*." 341 F.3d at 287. However, we have held that Rule 8(a) "'applies only to prosecutions involving a single defendant" and that in a multi-defendant case such as this, 'the tests for joinder of counts and defendants is merged in Rule 8(b).'" *Id.* (quoting *United States v. Somers*, 496 F.2d 723, 729 n.8 (3d Cir. 1974)). Accordingly, we analyze Walker's misjoinder challenge under Rule 8(b).

Under Rule 8(b), "[i]t is not enough that defendants are involved in offenses of the same or similar character; there must exist a transactional nexus in that the defendants must have participated in 'the same act or transaction, or in the same series of acts or transactions,' before joinder of defendants in a multiple-defendant trial is proper." *Jimenez*, 513 F.3d at 82-83 (quoting Fed. R. Crim. P. 8(b); citing *Irizarry*, 341 F.3d at 287 n.4). Where charges leveled against only a single defendant "arose directly" from her participation in a common illicit enterprise which led to charges against that defendant and co-defendants, we have held that all of the charges may be considered part of the same series of acts, rendering joinder proper under Rule 8(b). *United States v. Riley*, 621 F.3d 312, 334 (3d Cir. 2010) ("In this case, it was Riley's failure to report income earned from the land fraud scheme that led to her Tax Fraud Counts. Because the tax

13

evasion arose directly from the land fraud proceeds, it was in the interest of judicial efficiency to join these claims.").

Barron Walker argues that joinder was improper because the first four counts of the indictment, including the conspiracy count, only covered conduct occurring before May 31, 2007, while the escape and additional drug charges against Barry Walker were both based on conduct occurring in July 2007. While a conspiracy count *may* serve as a link justifying the joinder of various substantive offenses, *see Eufrasio*, 935 F.2d at 567, joinder may still be proper in the absence of a conspiracy count covering the time period for every substantive offense if those substantive offenses were part of the same series of transactions. In this case, the two escape-related charges against Barry Walker were properly joined because they arose directly from the earlier drug, conspiracy, and gun charges. In so holding, we agree with the analysis of Rule 8(b) by the district court in *United States v. Avila*:

> [T]he government may charge escape-related crimes alongside underlying offenses if the two are closely related to one another. This nexus depends upon the temporal proximity between the offenses, whether the defendant escaped to evade prosecution for the underlying offense, and whether the defendant was in custody for the underlying offense at the time of the flight.

610 F. Supp. 2d 391, 395 (M.D. Pa. 2009) (citations omitted).

Barry Walker's evident purpose in escaping from pretrial detention was to evade prosecution for the offenses charged in the first four counts of the indictment. If it were

14

not for the underlying offenses, Walker would not have been arrested and then able to escape from custody. Similarly, the additional drug charge arose directly from the initial charges, because at the time of Walker's re-arrest and the discovery of cocaine on his person the police were searching for him in an effort to return him to custody so that he could be tried for the four charges then pending against him. We note, in addition, that the short span of time between the initial offenses and the two charges against Barry Walker—a period of a little over a month—further suggests that the various charges were part of the same series of transactions. Accordingly, we conclude that the defendants were properly joined pursuant to Rule 8(b).

### B. Rule 14

We review whether a motion for severance to prevent prejudice should have been granted pursuant to Rule 14 under an abuse of discretion standard. *Riley*, 621 F.3d at 334; *United States v. Davis*, 397 F.3d 173, 182 (3d Cir. 2005). While Rule 8 requires severance where defendants were improperly joined, Rule 14 permits a district court "to sever properly joined defendants and order a separate trial where a consolidated trial appears to prejudice the defendant." *Id.* at 82 n.7; *see also* Fed. R. Crim. P. 14(a) ("If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."). The district court may order severance to prevent the "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Reyeros,* 537 F.3d 270, 287 (3d

15

Cir. 2008).

To prevail on a Rule 14 motion, a defendant must "'"pinpoint clear and substantial prejudice resulting in an unfair trial.'" *Riley*, 621 F.3d at 335 (quoting *United States v. McGlory*, 968 F.2d 309, 340 (3d Cir. 1992)). As a result, "a defendant is not entitled to a severance merely because evidence against a co-defendant is more damaging than the evidence against the moving party." *United States v. Lore*, 430 F.3d 190, 205 (3d Cir. 2005) (internal quotation marks omitted). Instead, the question of prejudice hinges upon "whether the jury will be able to compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility." *Davis*, 397 F.3d at 182. Where additional charges against a single defendant are "relatively straightforward and discrete," we have "not doubt[ed] that the jury reasonably could have been expected to compartmentalize the evidence . . . and actually did so." *Lore*, 430 F.3d at 205. By contrast, "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability, the risk of prejudice is heightened." *Zafiro*, 506 U.S. at 539.

We hold that the District Court did not abuse its discretion by declining to grant Barron Walker's Rule 14 motion to sever. We reach this conclusion for two primary reasons. First, although the defendants were brothers, they were the only two defendants in a trial that lasted a total of four days and that featured charges arising from only three distinct episodes of criminal conduct. *See Davis*, 397 F.3d at 182 ("In this case, the facts are relatively simple; all the events occurred in a single evening; there are only three defendants; and there are no overly technical or scientific issues. Therefore, we conclude that the jury could reasonably

16

have been expected to compartmentalize the evidence as it related to each individual defendant."). With respect to the escape-related counts, the evidence presented at trial concerning Barry's escape and subsequent arrest was relatively uncomplicated, suggesting that the jury would have little trouble keeping it separate from the evidence against Barron. Accordingly, the District Court did not abuse its discretion in concluding that the jury would have been able to compartmentalize the evidence presented against Barry Walker with respect to the escape and the additional drug charge.[7] *See id.* (holding that jurors could compartmentalize the conduct of a co-defendant who fled from scene of crime from evidence regarding defendant who did not flee).

Second, the district judge instructed the jury that "[e]ach offense and each defendant must be considered separately." The judge also told the jury that its "decision on any one defendant or any one offense, whether guilty or not guilty, should not influence your decision on any other defendant or any other offense." We presume that the jury followed those instructions, "and thus we regard the instructions as persuasive evidence that refusals to sever did not prejudice the defendants." *Lore*, 430 F.3d at 206 (internal quotation marks and alteration omitted).

## III. Use of a Firearm in Furtherance of Drug Distribution

---

[7] Moreover, even if the evidence against Barry Walker was marginally stronger on certain joint counts, the defendants did not have the kind of "markedly different degrees of culpability" that would suggest a heightened risk of prejudice. *Zafiro*, 506 U.S. at 539.

17

The Walkers both argue that insufficient evidence supported their convictions under Count III for the possession of a firearm in furtherance of drug trafficking during the weeks before May 31, 2007, in violation of 18 U.S.C. § 924(c).

In reviewing a motion for a judgment of acquittal due to insufficient evidence pursuant to Federal Rule of Criminal Procedure 29, we apply a "particularly deferential standard . . . because a reviewing court 'must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence.'" *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010) (quoting *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010)). Accordingly, we must "view the evidence in the light most favorable to the prosecution and sustain the verdict unless it is clear that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citing *United States v. Cunningham*, 517 F.3d 175, 177 (3d Cir. 2008)). We examine "the totality of the evidence, both direct and circumstantial," *United States v. Sparrow*, 371 F.3d 851, 852 (3d Cir. 2004) (internal quotation marks omitted), and only "when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt" will we reverse a jury verdict for insufficiency of the evidence. *United States v. Mussare*, 405 F.3d 161, 166 (3d Cir. 2005).

Under 18 U.S.C. § 924(c), it is a crime if an individual uses or carries a firearm during and in relation to a drug trafficking crime, or possesses a firearm in furtherance of

18

such a crime.[8]  To obtain a conviction under § 924(c), "the 'mere presence' of a gun is not enough."  *Sparrow*, 371 F.3d at 853.  Rather, the government must present evidence "specific to the particular defendant, showing that his or her possession actually furthered the drug trafficking offense." *Id.* (internal quotation marks omitted).  In other words, "the government must show that the defendant possessed the firearm 'to advance or promote criminal activity.'" *United States v. Iglesias*, 535 F.3d 150, 157 (3d Cir. 2008) (quoting *United States v. Bobb*, 471 F.3d 491, 496 (3d Cir. 2006)).  In determining whether a firearm was possessed in furtherance of drug trafficking, we have looked to the following nonexclusive factors:

> the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances

---

[8] *See* 18 U.S.C. § 924(c)(1)(A) ("[A]ny person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime be sentenced to [various punishments described].").

under which the gun is found.

*Sparrow*, 371 F.3d at 853 (3d Cir. 2004) (quoting *United States v. Ceballos–Torres,* 218 F.3d 409, 414–15 (5th Cir. 2000)); *see also Bobb*, 471 F.3d at 496-97 (applying *Sparrow* factors).

We have also recognized that § 924(c) may be violated through the constructive possession of a firearm. *See Cunningham*, 517 F.3d at 178. We have defined constructive possession as follows:

> "Constructive possession exists if an individual knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons. Constructive possession necessarily requires both dominion and control over an object and knowledge of that object's existence."

*Id.* (quoting *United States v. Iafelice*, 978 F.2d 92, 96 (3d Cir. 1992)). Constructive possession may be proved by either direct or circumstantial evidence, and it need not be exclusive to a single person. *Iglesias,* 535 F.3d at 156.

We hold that the evidence presented at trial, viewed in the light most favorable to the prosecution, was sufficient to sustain both Walkers' § 924(c) convictions. The strongest evidence supporting these charges was the testimony of Skylar Rhoades, the confidential informant, who stated that he observed Barry Walker in actual possession of a gun during a drug sale in which the Walker brothers participated:

20

> I was with Jason McNeil. . . . We drove up. I looked into the [Walkers'] Expedition. I see Barron and Barry Walker both inside the Expedition. Barry gets out. I could see the gun on his waistband, and I could see Barron with crack cocaine on his lap. They g[a]ve . . . John McNeil about a quarter to an eightball of crack cocaine, and then that's when I took down the license plate to the Expedition to [transmit] it back to [law enforcement.]

Based on this direct eyewitness testimony, a rational juror could readily conclude that Barry Walker actually possessed a firearm at the time of the cocaine sale.[9] Further, a rational juror could infer that Barry Walker possessed the firearm in order to "advance or promote" the illegal sale. *Iglesias*, 535 F.3d at 157. Several of the *Sparrow* factors favor such an inference: Barry Walker, together with his brother, engaged in the sale of crack cocaine, an illegal and dangerous drug; the firearm—located on Barry's hip—was readily available in the event he needed it for protection during the sale; the firearm was in close proximity to the cocaine that was handed

---

[9] Barry Walker mistakenly seeks support from the Supreme Court's decision in *Bailey v. United States*, 516 U.S. 137, 143 (1995), which held that mere possession of a firearm is not sufficient to support a conviction under § 924(c). As the Supreme Court has recognized, Congress amended § 924 in 1998 to add the word "possess" to the statute, thus overturning *Bailey*. *See United States v. O'Brien*, 130 S. Ct. 2169, 2179 (2010).

21

to John McNeil; and the firearm was in Barry Walker's possession throughout the course of the transaction. *See Sparrow*, 371 F.3d at 853.

While there is no evidence in the record concerning certain factors—it is uncertain, for example, whether Barry Walker's gun was stolen and whether it was loaded during the sale—our prior decisions have not required that every single factor must weigh in favor of conviction. *See Sparrow*, 371 F.3d at 853-54 (upholding conviction where "many of the . . . factors are satisfied" and holding that "immediate accessibility at the time of search or arrest is not a legal requirement for a § 924(c) conviction"); *Bobb*, 471 F.3d at 496 (upholding conviction where the evidence was "sufficient to find a nexus between the possession of the gun and the drug trafficking, and to satisfy many of the [*Sparrow*] factors"). Accordingly, we conclude that the prosecution presented enough evidence that a rational jury could conclude that Barry Walker not only actually possessed a firearm, but did so in furtherance of drug trafficking.

The evidence against Barron Walker on the § 924(c) charge was also sufficient to sustain his conviction. Barron's conviction was supported by the testimony of both Jason McNeil and Skylar Rhoades.[10] While being questioned by the prosecution, McNeil testified that he accompanied the Walkers as they drove through Harrisburg and made five to

---

[10] The defendants claim that the "entire case" for the prosecution consisted of the testimony of confidential informant Skylar Rhoades. This is incorrect: as noted in the remainder of the paragraph above, the testimony of Jason McNeil also supported the jury's verdict on this count.

22

ten deliveries of crack cocaine to customers. McNeil then explained that he saw the Walkers with firearms during these deliveries. When asked who had a firearm, he said "I think it was Barron." When questioned further on cross-examination, he admitted that he was not "positive" that Barron actually possessed the firearm.

Standing alone, this testimony might be insufficient to sustain Barron's conviction, because the witness himself had some doubt about whether Barron had the firearm on his person. However, this evidence does not stand alone: Skylar Rhoades testified that he saw Barron and Barry arrive together in the same vehicle, that Barron had cocaine in his possession, and that Barron and Barry jointly made a cocaine sale while Barry wore a gun on his hip.

A rational juror, considering the testimony of Rhoades and McNeil together, could conclude that Barron at the very least had constructive possession of a firearm during the brothers' drug sales. During the cocaine sale witnessed by Rhoades, the gun on Barry's hip was readily visible to Rhoades, supporting the inference that it was also visible to Barron, who was a joint participant in the sale. Accordingly, the jury could rationally have concluded that Barron knew that Barry possessed the firearm, rendering this case distinguishable from our § 924(c) decisions involving guns in closed containers. *See Cunningham*, 517 F.3d at 179 (holding that defendant did not constructively possess gun in his companion's backpack where the "evidence did not demonstrate that [the defendant] knew about the gun" (internal quotation marks omitted)); *United States v. Garth*, 188 F.3d 99, 112 (3d Cir. 1999) (holding that defendant who was unaware that his co-defendants possessed a firearm in a black bag did not constructively possess it). The jury could

23

likewise have reasonably concluded that Barron had the intention to exercise dominion over the firearm through Barry, because the firearm provided protection to both of them during their sales. *See Iafelice*, 978 F.2d at 96 (constructive possession exists "if an individual knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or *through another person or persons*" (emphasis added)). Moreover, as we noted in *Iafelice*, "[c]ommon sense counsels that an owner and operator of a vehicle usually has dominion and control over the objects in his or her vehicle of which he or she is aware." *Id.* at 97. In this case, Barry was observed with the gun as he exited the Walkers' vehicle, strengthening the conclusion that Barron was both aware of the gun and exercised a level of indirect control sufficient to support the verdict.[11]

For similar reasons, there was sufficient evidence for the jury to conclude that Barron's constructive possession of a firearm was in furtherance of a drug trafficking crime. During the sale witnessed by Rhoades, Barron had cocaine in

---

[11] Barron's attempt to rely upon *United States v. Jenkins*, 90 F.3d 814 (3d Cir. 1996), is unpersuasive. In *Jenkins*, police discovered the defendant in an acquaintance's apartment sitting in front of a coffee table that contained guns, bags of cocaine, scales, and other drug paraphernalia. This court found that there was insufficient evidence that the defendant had constructive possession of these items where no drug residue was found on him and his fingerprints were not found on the drugs. *Id.* at 818. In this case, by contrast, two eyewitnesses testified that Barron jointly participated in cocaine sales with Barry.

24

his lap, and then jointly participated in a sale of cocaine with Barry while Barry was carrying a gun. The firearm on Barry's hip was easily accessible in case both Walkers needed it for protection. Barron and Barry arrived in the same vehicle, putting Barron in close proximity to the firearm both before and during the sale. Because Rhoades was able to see the gun on Barry's hip, the jury could infer that the gun was also visible to Barron. Together, this evidence was enough to show that Barron's constructive possession of the gun advanced his illegal drug activity. *See Sparrow*, 371 F.3d at 853 (noting relevance of "the type of drug activity that is being conducted," the "accessibility of the firearm," and the "proximity to drugs or drug profits").

Accordingly, while the prosecution's case on these charges was not overwhelming, we conclude that the evidence presented on the § 924(c) charges was sufficient to sustain the defendants' convictions.

## IV. Hobbs Act Expert Testimony

At trial, the government's expert on cocaine trafficking, Chief Goshert, rendered the opinion that cocaine is manufactured outside of Pennsylvania and transported into the state. In this appeal, the Walkers argue that the District Court erred in allowing Goshert to testify in support of the Hobbs Act charge.

First, the Walkers argue that the prosecution failed to give them timely notice of the expert testimony. The government first notified the defense of its intent to call Goshert on August 6, 2008, five days before trial, and volunteered to provide a summary of his testimony to the defense. Defense counsel objected to the testimony, claiming

25

that the government should have given them more notice that Goshert would be called as an expert. The District Court rightly rejected this argument on the ground that the defendants had not requested expert notification pursuant to Rule 16 of the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 16(a)(1)(G) ("*At the defendant's request*, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." (emphasis added)); *United States v. Davis*, 397 F.3d 173, 178 ("[T]he government must disclose, *upon a defendant's request*, 'a written summary of any testimony that the government intends to use.'" (emphasis added) (quoting Fed. R. Crim. P. 16(a)(1)(G)).[12]

Second, the Walkers argue that Chief Goshert should not have been allowed to testify that cocaine is manufactured outside of Pennsylvania and transported into the state. Specifically, the Walkers argue that Goshert's testimony was unreliable because Wright could have possessed synthetic cocaine manufactured in Pennsylvania. The Walkers point out that recipes for synthetic cocaine are readily available on the internet, and they also cite a series of court decisions from

---

[12] Barry Walker also argues that he filed a pro se motion to compel discovery on May 27, 2008, in which he requested information regarding expert testimony. However, as Barry Walker acknowledges, that pro se motion was stricken by the District Court on June 3, 2008, and forwarded to counsel of record. *Id.* Thus, the request was not properly made to the government.

26

the 1970s and 1980s which recognized that cocaine could be manufactured domestically. The Walkers also note that Goshert admitted during his testimony that he is unable to distinguish synthetic cocaine from cocaine made from cocoa plants.

We review a district court's decision to admit expert testimony for abuse of discretion and exercise plenary review over a district court's legal interpretation of Rule 702 of the Federal Rules of Evidence. *United States v. Mitchell*, 365 F.3d 215, 233 (3d Cir. 2004). "An expert witness may be permitted to testify regarding 'scientific, technical, or other specialized knowledge' if it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *United States v. Mornan,* 413 F.3d 372, 380 (3d Cir. 2005) (quoting Fed. R. Evid. 702). Under Rule 702, a witness may qualify as an expert if three requirements are satisfied: "(1) the testimony must be 'based upon sufficient facts or data'; (2) the testimony must be 'the product of reliable principles and methods'; and (3) the witness must have 'applied the principles and methods reliably to the facts of the case.'" *Id.* (quoting Fed. R. Evid. 702). In cases not involving scientific testimony, courts must still serve the gatekeeping function described in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), but "'the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 329 (3d Cir. 2002) (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999)). In such cases "'the relevant reliability concerns may focus upon personal knowledge or experience.'" *Id.* (quoting *Kumho Tire*, 526 U.S. at 150).

The Walkers argue that Goshert, who acknowledged at trial that he is not a chemist and is unable to distinguish ordinary cocaine from synthetic cocaine, did not have the requisite expertise to testify about the geographic origins of the cocaine in Pennsylvania. We disagree. Goshert's testimony was based upon his thirty years of experience working as a narcotics investigator in Harrisburg, Pennsylvania. Goshert testified that during that time period he regularly participated in investigations involving the importation of cocaine into the Harrisburg area, that he spoke with drug traffickers on a daily basis, and that he had worked with a variety of other law enforcements agencies, including the Drug Enforcement Administration and New York Police Department. He also testified that he had taught courses and seminars on drug trafficking and drug identification to new and experienced police officers, to the Pennsylvania District Attorney's Association, and to community groups. Upon being qualified as an expert, Goshert identified New York City as the primary source for cocaine in the Harrisburg area, and testified that in his thirty years of investigating cocaine cases he had never had a single law enforcement agent, informant, drug trafficker, or other individual indicate that cocaine was manufactured inside Pennsylvania.

We agree with the District Court that Goshert's method for reaching these conclusions was reliable. Our court has previously recognized that law enforcement officials can rely upon their specialized knowledge or experience to offer expert testimony on various aspects of drug trafficking. *See, e.g.*, *United States v. Perez*, 280 F.3d 318, 342 (3d Cir. 2002) (expert opinion on how drug traffickers use cellular telephones and pagers); *United States v. Gibbs*, 190 F.3d 188, 211 (3d Cir. 1999) (expert testimony

28

on coded drug language). We have also recognized that law enforcement officers may, given the proper experience, testify in a Hobbs Act case regarding whether goods had originally been produced in another state. *See United States v. Haywood*, 363 F.3d 200, 210–11 (3d Cir. 2004) (holding that police officer who was a resident of the Virgin Islands had sufficient knowledge to testify that beer sold by bar originated in the mainland United States).

Goshert's expert opinions were based upon his personal experiences interacting with drug traffickers and law enforcement personnel over a period of decades. During that time, he had numerous opportunities to investigate the geographic origins of the cocaine sold in Harrisburg. Accordingly, he did not need to be a professional chemist in order to gather reliable information on whether cocaine was being produced inside Pennsylvania or instead being produced elsewhere and transported into Pennsylvania. *See Betterbox*, 300 F.3d at 328–29 (noting that specialized knowledge can be based upon "practical experience as well as academic training and credentials" (internal quotation marks omitted)).

We also hold that Goshert's expert testimony was not rendered unreliable by the evidence the defense presented regarding the possibility of manufacturing cocaine synthetically. Although it may be possible to find recipes for synthetic cocaine on the internet, the defense presented no evidence that synthetic cocaine has, at any time in the recent past, actually been manufactured in Pennsylvania. Further, although the Walkers cite to a series of court decisions from the 1970s and 1980s which recognized that cocaine can be manufactured domestically, none of these cases involved conduct occurring in Pennsylvania, or conduct that occurred

29

in the last twenty years. *See Turner v. United States*, 396 U.S. 398 (1970);[13] *United States v. Whaley*, 779 F.2d 585 (11th Cir. 1986); *United States v. Lamoureux*, 711 F.2d 745 (6th Cir. 1983). Indeed, more recent cases have suggested that it is common knowledge that cocaine is imported into the United States from Latin America. *See United States v. Gomez*, 580 F.3d 94, 102 (2d Cir. 2009) ("The importation and interstate transportation of cocaine, as well as the financial size of the cocaine trade, have been routinely and copiously discussed by public officials, candidates for office, and the news media for decades.").[14]

---

[13] In *Turner*, the Supreme Court struck down a statute which provided that a person found to possess cocaine shall be presumed to have imported it. *See* 396 U.S. at 418. The Court, surveying the evidence as it existed in 1970, found that "much more cocaine is lawfully produced in this country than is smuggled into this country." *Id.* No similar statutory presumption of importation exists under the Hobbs Act, and the government did not attempt to suggest that the jury should entertain such a presumption. Moreover, the Supreme Court's factual finding that, in 1970, more cocaine was produced domestically than imported does not bar later courts from recognizing that patterns of production and distribution have changed. Thus, in this case, the government presented expert testimony establishing that cocaine is currently imported from out of state and is not manufactured in Pennsylvania.

[14] The parties assume, as do we for purposes of this appeal, that the place of origin of cocaine is sufficiently technical in nature to be the subject of expert testimony under Rule 702. *But see United States v. Needham*, 604 F.3d 673, 680 (2d Cir.

30

Accordingly, we agree with the government that the District Court did not abuse its discretion in determining that Chief Goshert's testimony regarding the interstate transportation of cocaine was reliable.

## V. Hobbs Act Interstate Commerce Element

The Walkers challenge whether the government's evidence was sufficient to satisfy the interstate commerce element of their Hobbs Act convictions. They note that the target of their attempted robbery, Edward Wright, had just completed his first-ever drug sale at the time of the robbery, had purchased the illegal drugs locally for about $60, and had made about $40 to $50 from his single sale. They also argue that the government presented insufficient evidence that Wright's cocaine was manufactured outside of Pennsylvania.

We begin with first principles. The Constitution delegates to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Congress' power to legislate pursuant to the Commerce Clause, although "greatly expanded" by the Court's New Deal-era commerce power decisions, is nonetheless "subject to outer limits." *United States v. Lopez*, 514 U.S. 549, 556–57 (1995) (citing *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937); *United States v. Darby,* 312 U.S. 100 (1941); *Wickard v. Filburn*, 317 U.S. 111 (1942)). In *Lopez*, the Court identified the three areas within which Congress is authorized to

_____

2010) (holding that "a jury is capable of concluding, based on its lay knowledge, that cocaine is imported into the United States" (citing *Gomez*, 580 F.3d at 102)).

31

regulate pursuant to the Commerce Clause: (1) "the use of the channels of interstate commerce;" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities;" and (3) "those activities having a substantial relation to interstate commerce." *Id.* at 558–59.

Focusing on the third category, the *Lopez* Court struck down the Gun-Free School Zones Act of 1990, holding that "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at 567. To reach any other conclusion, the Count held, would require it to "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.*

The Court's decision in *Lopez* was followed by *United States v. Morrison*, which struck down the civil remedy provision in the Violence Against Women Act using reasoning that closely echoed that in *Lopez*. *See* 529 U.S. 598, 617 (2000) (holding that Congress may not "regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce"). *Morrison*, in turn, was followed by *Gonzales v. Raich*, which rejected a Commerce Clause challenge to the application of provisions of the Controlled Substances Act criminalizing the manufacture, distribution, and possession of marijuana to intrastate growers and users of marijuana for medicinal purposes. 545 U.S. 1 (2005). In so holding, the Court emphasized that Congress possesses "power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate

32

commerce." *Id.* at 17.  Congress is not required:

> to legislate with scientific exactitude. When Congress decides that the total incidence of a practice poses a threat to a national market, it may regulate the entire class. In this vein . . . when a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.

*Id.* (internal quotation marks and citations omitted).

We have recognized that this trio of commerce power decisions establishes a four-part analytical framework "'to determine whether a law regulates intrastate activity that has a substantial effect on interstate commerce.'" *United States v. Kukafka*, 478 F.3d 531, 535 (3d Cir. 2007) (quoting *United States v. Gregg*, 226 F.3d 262 (3d Cir. 2000)).  Under this framework, "a court should consider: (1) 'the economic nature of the regulated activity;' (2) 'a jurisdictional element limiting the reach of the law to a discrete set of activities that additionally has an explicit connection with or effect on interstate commerce;' (3) 'express congressional findings regarding the effects upon interstate commerce of the activity in question;' and (4) 'the link between the regulated activity and interstate commerce.'" *Id.* at 535–36 (quoting *Gregg, 226 F.3d at 262); *see also United States v. Spinello*, 265 F.3d 150, 155–56 (3d Cir. 2001).

To obtain a conviction under the Hobbs Act, the government must show that (1) the defendant committed "robbery or extortion" or attempted or conspired to do so, and (2) that conduct "obstruct[ed], delay[ed], or affect[ed]

33

commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). The Hobbs Act defines the term "commerce" broadly to include "all . . . commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3); *see also Stirone v. United States,* 361 U.S. 212, 215 (1960) ("[The Hobbs Act] speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence."). Accordingly, the reach of the Hobbs Act is "coextensive with that of the Commerce Clause of the United States Constitution." *United States v. Parkes*, 497 F.3d 220, 230 n.8 (2d Cir. 2007) (internal quotation marks and citation omitted); *see also United States v. Villafranca*, 260 F.3d 374, 377 (noting that "the Hobbs Act's required effect on interstate commerce is identical with the requirements of federal jurisdiction under the Commerce Clause" (citation omitted)).

The Hobbs Act differs from the statutes struck down in *Lopez* and *Morrison* in two crucial respects. First, the Hobbs Act contains a "jurisdictional element" which limits its scope. That is, the Hobbs Act "only applies to crimes which 'obstruct[ ], delay[ ], or affect[ ] commerce or the movement of any article or commodity in commerce.'" *United States v. Clausen*, 328 F.3d 708, 710 (3d Cir. 2003) (quoting 18 U.S.C. § 1951(a)). Second, the Hobbs Act regulates quintessentially "economic" activities. Although drawing the line between "economic" and "non-economic" activities may sometimes be difficult, property crimes like robbery and extortion are— unlike the possession of a gun in a school zone or gender-motivated violence—indisputably "economic" under our post-*Lopez* precedents. *See United States v. Bishop*, 66 F.3d 569, 581 (3d Cir. 1995) ("[C]arjacking is economic . . . .

34

When a criminal points a gun at a victim and takes his or her car, the criminal has made an economic gain and the victim has suffered an undeniable and substantial loss."); *Spinello*, 265 F.3d at 156 (describing bank robbery as an "'economic' activity almost by definition"); *United States v. Whited*, 311 F.3d 259, 268 (3d Cir. 2002) ("[T]heft in connection with health care . . . is economic in nature. The theft itself is motivated exclusively by an immediate pecuniary gain, and effects an explicit economic transfer." (citations omitted)).

Because of the fundamentally economic character of robbery and extortion, we have held, in the wake of *Lopez* and its progeny, that in *Lopez* category-three cases[15] the government is not required to present "proof of a 'substantial effect' on commerce in an individual case in order to show a Hobbs Act violation." *Urban*, 404 F.3d at 766 (citing *Clausen*, 328 F.3d at 711); *accord Raich*, 545 U.S. at 17 (holding that Congress possesses the "power to regulate

---

[15] As noted above, category three encompasses "those activities having a substantial relation to interstate commerce." 514 U.S. at 558-59. Because the parties have not suggested that this case falls under the second *Lopez* category, which permits Congress to regulate "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities," *id.* at 558, we do not address its applicability to this case. As discussed below, however, we do find the fact that the cocaine the Walkers targeted originated outside Pennsylvania relevant to the category-three inquiry of whether there was a sufficiently close "link between the regulated activity and interstate commerce." *Kukafka*, 478 F.3d at 536.

purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce"). As we noted in *Clausen*, "'the cumulative result of many Hobbs Act violations is a substantial effect upon interstate commerce,' and that substantial effect empowers Congress to regulate pursuant to the Commerce Clause." 328 F.3d at 711 (quoting *United States v. Robinson,* 119 F.3d 1205, 1215 (5th Cir. 1997)); *see also Urban*, 404 F.3d at 765 (noting that "'legislation concerning an intrastate activity will be upheld if Congress could rationally have concluded that the activity, in isolation or in the aggregate, substantially affects interstate commerce'" (quoting *Robinson,* 119 F.3d at 1211)).

Accordingly, we have held that in a Hobbs Act prosecution, "'proof of a *de minimis* effect on interstate commerce is all that is required.'" *Urban*, 404 F.3d at 766 (quoting *Clausen*, 328 F.3d at 711). We have also upheld jury instructions which state that the "'*de minimis* effect' in an individual Hobbs Act case need only be 'potential.'" *Id.* at 766 (quoting *Haywood*, 363 F.3d at 209–10); *see also Haywood*, 363 F.3d at 209-10 ("'[I]f the defendants' conduct produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential, it is sufficient to uphold a prosecution under [§ 1951].'" (quoting *Jund v. Town of Hempstead*, 941 F.2d 1271, 1285 (2d Cir. 1991))).

The Walkers make several arguments in support of their insufficiency claim. First, they emphasize that the robbery victim, Edward Wright, had purchased only $60 worth of crack cocaine, and had made only a single sale for about $40 to $50 at the time of the robbery. While Wright did indeed possess only a small amount of cocaine and cash,

36

we have found the *de minimis* standard satisfied in similarly low-stakes robberies. *See Haywood*, 363 F.3d at 202, 211 n.7 (holding that "interstate commerce was affected, however minimally" by the robbery of $50 to $70 in cash from a bar).

Second, the Walkers argue that the evidence was insufficient to demonstrate that Wright's cocaine originated from outside of Pennsylvania. As discussed in the prior section, the government presented reliable expert testimony from Chief Goshert that the cocaine sold in Harrisburg is manufactured outside of Pennsylvania and transported into the state. This case is therefore distinguishable from cases involving marijuana in which the government's evidence that the marijuana was grown out of state was more equivocal. *See United States v. Peterson*, 236 F.3d 848, 853–54 (7th Cir. 2001) (noting DEA agent's testimony that brick marijuana did not "normally" originate in Indiana, but that it was "possible" but "highly unlikely" the marijuana was grown in Indiana). Accordingly, a rational juror could conclude from Goshert's testimony that Wright's cocaine was not produced in Pennsylvania.

Third, the Walkers argue that their convictions should be overturned because they robbed a "private citizen" rather than a business. In making this argument, the Walkers cite to the Sixth Circuit's decision in *United States v. Wang*, 222 F.3d 234 (6th Cir. 2000). *Wang* is one of several decisions by our sister circuits holding that the government may not demonstrate that the robbery of a private individual's personal property affected interstate commerce based solely on evidence that the victim was employed by a company operating in interstate commerce. *See id.* at 239 ("[A] small sum stolen from a private individual does not, through aggregation, affect interstate commerce merely because the

37

individual happens to be an employee of a national company . . . ."); *United States v. Perrotta*, 313 F.3d 33, 36 (2d Cir. 2002) ("[T]he government must show something more than the victim's employment at a company engaged in interstate commerce to support Hobbs Act jurisdiction."); *United States v. Collins*, 40 F.3d 95, 100 (5th Cir. 1994) (overturning Hobbs Act conviction where the robbery victim "was an individual whose only connection with interstate commerce was his employment by a business engaged in interstate commerce").

Even if these decisions are correct—a question not before us today—they are unhelpful to the Walkers. The central rationale of decisions such as *Wang* is that courts should not "apply the aggregation principle in conjunction with long chains of causal inference that would have been necessary to arrive at a substantial effect on interstate commerce." *Wang*, 222 F.3d at 239; *see also Lopez*, 514 U.S. at 567 ("To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States."). In other words, these decisions held that the mere facts that (1) an individual was robbed of personal property, (2) the individual happens to work for a company engaged in interstate commerce, and (3) there was some incidental effect on that person's job performance are insufficient, standing alone, to establish Hobbs Act jurisdiction, because the connection between the robbery and interstate commerce is too attenuated.

The connection between the robbery in this case and interstate commerce is much more direct. At the time of the robbery, Wright was selling illegal drugs. As we recognized

38

in *United States v. Orozco*, "[a] large interstate market exists for illegal drugs. Congress has the power to regulate that market just as it has the power to regulate food and drugs in general." 98 F.3d 105, 107 (3d Cir. 1996). In the wake of the Supreme Court's decision in *Raich*, which held that Congress' authority under the Commerce Clause includes "the power to prohibit the local cultivation and use of marijuana," 545 U.S. at 5, an argument can be made that any robbery of illegal drugs—even drugs grown and sold entirely within a single state—interferes with the national market for illegal drugs and therefore has a sufficient connection to interstate commerce to create jurisdiction under the Hobbs Act. *See Needham*, 604 F.3d at 688 (Cabranes, J., dissenting) (arguing that, in light of *Raich*, the "term 'commerce' in the Hobbs Act—whose 'reach' is 'coextensive' with the Commerce Clause—includes purely 'homegrown' marijuana" (citation omitted)). On this view, merely by attempting to rob an individual drug dealer, the Walkers were directly seeking to "obstruct[] . . . the movement of [a] . . . commodity in commerce." 18 U.S.C. § 1951(a).

In this case, there is no need to embrace such a broad proposition, because there is also evidence that the cocaine Wright possessed originated outside of Pennsylvania. As several of our sister circuits have concluded, the government may satisfy the interstate commerce element of the Hobbs Act by proving that a robbery targeted a drug dealer whose wares originated out of state. As Judge Posner explained for the Seventh Circuit in *United States v. Thomas*, a robbery which interferes with the sale of drugs "obstruct[s] commerce in a pretty literal sense." 159 F.3d 296, 297 (7th Cir. 1998). The cocaine in *Thomas* "originated in South America, and would thus have traveled in commerce." *Id.* By robbing the

prospective buyer of $675 that would have been used to purchase cocaine, the defendant in *Thomas* "thwarted what would have been a sale in commerce within the meaning of the Hobbs Act." *Id.* at 297–98. The fact that:

> the amount of cocaine in contemplation [in *Thomas*] was small is irrelevant. . . . [T]he relevant issue is the effect on commerce of the *entire* class of transactions to which the transaction or transactions at issue in the particular case belong . . . . Any other rule would leave the federal government helpless to deal with criminal acts that have an individually trivial but cumulatively significant effect on the movement of goods and services across state and international boundaries.

*Id.* at 298; *see also Raich*, 545 U.S. at 17 ("When Congress decides that the total incidence of a practice poses a threat to a national market, it may regulate the entire class." (internal quotation marks and citation omitted)).

Employing similar reasoning, several other courts of appeals have found that stealing drugs that were produced out of state from a drug trafficker satisfies the interstate commerce element of the Hobbs Act. *See United States v. McCraney*, 612 F.3d 1057, 1065 (8th Cir. 2010) ("The evidence here showed that the cocaine stolen from Jones necessarily originated in South America, and that Jones intended to sell it in Iowa. The taking of that cocaine by Williams thus disrupted the movement of a commodity in interstate commerce."); *United States v. DeCologero*, 530 F.3d 36, 68 (1st Cir. 2008) (observing that "[t]he robbing of a drug dealer typically has the required nexus with interstate

40

commerce" and finding evidence sufficient where robbery of drug dealer netted $18,000 and government expert testified that cocaine originates in South America); *Parkes*, 497 F.3d at 231 (holding that evidence was sufficient to support a Hobbs Act conviction for attempted robbery of a large bag of marijuana, fifty-eight smaller "nickel bags" of marijuana, and $4,000 cash from "a local, part-time marijuana dealer" in New York, where testimony showed that marijuana "is almost exclusively trucked into the United States, predominantly through Mexico," and that "[v]ery little marijuana is grown in New York" (internal quotation marks and citation omitted); *United States v. Ostrander*, 411 F.3d 684, 692 (6th Cir. 2005) ("The prosecution offered evidence that the cocaine and marijuana Hansle Andrews sold originated in Latin America, and thus had to get to Michigan through interstate commerce. . . . In this case, the robbery and murder [of Andrews] obviously reduced the amount of drugs Andrews could buy and sell in interstate commerce."); *United States v. Williams*, 342 F.3d 350, 355 (4th Cir. 2003) ("Drug dealing . . . is an inherently economic enterprise that affects interstate commerce. For this reason, the robbery of a drug dealer has been found to be the kind of act which satisfies the 'affecting commerce' element of the Hobbs Act, inasmuch as such a robbery depletes the business assets of the drug dealer." (citation omitted)).

These decisions by our sister circuits reinforce our view that the robbery of a drug dealer whose product originates outside Pennsylvania has a direct nexus to interstate commerce. Accordingly, we reject the Walkers' invitation to treat this drug dealer robbery case like the kinds

41

of home invasion robberies at issue in cases such as *Wang*.[16]

Fourth, we reject the Walkers' argument that the Hobbs Act does not apply to their conduct because they robbed a first-time drug dealer. "Congress's power to criminalize . . . conduct pursuant to the Commerce Clause turns on the economic nature of the *class of conduct* defined in the statute rather than the economic facts . . . of a single case." *United States v. Morales-de Jesús*, 372 F.3d 6, 18 (1st Cir. 2004) (emphasis added); *see also Raich*, 545 U.S. at 17 (observing that Congress is not required "to legislate with scientific exactitude"). The Walkers attempted to rob a drug trafficker. As explained above, such robberies, in the aggregate, have a substantial effect on the interstate market for illegal narcotics. The fact that the Walkers happened to rob a neophyte drug dealer is irrelevant to whether their conduct fits within the "class of activities" prohibited by the

---

[16] Indeed, *Wang* itself recognized that the government can demonstrate a nexus between the robbery of personal property and interstate commerce by showing "that the defendant knew of or was motivated by the individual victim's connection to interstate commerce." 222 F.3d at 240; *see also United States v. Diaz*, 248 F.3d 1065, 1088–89 (11th Cir. 2001) ("What sets this case apart is the fact that the role of the Martins with regard to their business, which was directly engaged in interstate commerce, was not coincidental. Rather, the Court is convinced by the evidence presented at trial that appellants targeted the Martins *because of* their interest in Rosa Medical Center."). In this case, the Walkers were motivated by Wright's connection to interstate commerce—that is, they sought to rob him because he was a drug dealer.

42

Hobbs Act.[17]  Moreover, as noted above, the effect of the defendants' conduct upon interstate commerce is only required to be "slight, subtle or even potential."  *Haywood*, 363 F.3d at 210 (internal quotation marks omitted).  There is no evidence in the record suggesting that the Walkers targeted Wright because it was his first day on the job.  Rather, the Walkers intended to rob a drug dealer, and it appears to have been pure happenstance that the target they selected was a first-time participant in drug trafficking.  Thus, the Walkers' conduct had the "potential" to interfere with the sales of more established drug dealers.

Finally, we reject the Walkers' argument that the evidence supporting their convictions was insufficient because the government did not use the so-called "depletion of assets" theory.  We have certainly held that this theory—under which "proof that a Hobbs Act violation depletes the assets of a business engaged in interstate commerce conclusively establishes the effect on commerce requirement," *Urban*, 404 F.3d at 762—*may* be used in Hobbs Act cases in the wake of *Lopez* and its progeny.  *See id.* at 766 & n.3 (affirming continued viability of depletion of assets theory).  However, we decline to hold that the depletion of assets theory is the exclusive means by which the Hobbs Act's interstate commerce element may be satisfied.  Such a holding would be contrary to the "broad language" of the Hobbs Act, *Stirone*, 361 U.S. at 215, which does "not lend

---

[17] Even if we consider the relevant class of activities in this case to be robberies of new drug dealers, such robberies are still "economic" activities under *Lopez*, and are likely, in the aggregate, to have a substantial effect on the market for illegal drugs.

[itself] to restrictive interpretation," *United States v. Culbert*, 435 U.S. 371, 373 (1978). *See also* 18 U.S.C. § 1951(a) (making it a federal crime to "in any way or degree . . . affect[] commerce . . . by robbery or extortion"). Thus, while the government can and often will rely upon the depletion of assets theory, it is only required to present evidence proving that the "defendants' conduct produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential." *Haywood*, 363 F.3d at 209-10. As explained above, the government presented sufficient evidence to satisfy that standard in this case.

In summary, we hold that by presenting evidence that (1) the Walkers attempted to rob a cocaine dealer of a *de minimis* amount of drugs and cash, and (2) the drug dealer's cocaine originated outside of Pennsylvania, the government presented sufficient evidence from which a rational juror could conclude that the Walkers' conduct satisfied the interstate commerce element of the Hobbs Act.

Of course, to hold that the Hobbs Act sweeps so broadly is not to encourage its use in every case to which it might apply. Indeed, there are cases, such as this one, in which its use to prosecute what could be considered a fairly garden-variety robbery gives us some pause. *See United States v. Rutherford*, 236 F. App'x 835, 844–45 (3d Cir. 2007) (non-precedential) (Ambro, J., concurring, joined by McKee, J.). Our concern is amplified by the fact that the Hobbs Act can serve, as it did in this case, as a predicate offense for a violation of 18 U.S.C. § 924(c), the first violation of which carries a mandatory five-year consecutive prison term, and the second violation of which carries an extremely harsh mandatory twenty-five year consecutive prison term. In this era of globalization where the apple at

44

one's local supermarket may come from Chile or New Zealand, it is increasingly difficult for robberies *not* to fall within the scope of the Hobbs Act, whose reach is co-extensive with the broad scope of Congress's commerce power, and it is perhaps similarly uncommon for modern robberies not to involve firearms. There is no doubt that robbery is a crime worth deterring through federal and state prosecution of those who engage in such acts. We trust and expect that federal prosecutors will exercise their broad prosecutorial discretion (with which we are loath to interfere, *see United States v. Abuhouran*, 161 F.3d 206, 216 (3d Cir. 1998)) to make the most effective use of federal resources, to avoid supplanting the state criminal systems that quite ably address classic state-law crimes, and to seek just and appropriate criminal sentences in the course of their representation of the United States.

## VI.    *Brady* Motion

Defendants next argue that the prosecution withheld exculpatory evidence material to their defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, they argue that the failure of the prosecution to disclose information regarding a March 8, 2007, incident involving Skylar Rhoades until after the trial prejudiced their defense and requires retrial. On that day, Rhoades was asked to make a controlled buy of at least one ounce of crack cocaine. Before the operation began, Rhoades was found in the possession of a coat in the trunk of his car, and in the pocket of that coat was a small amount of suspected crack cocaine. The sample was sent to a lab, where it was determined that the total weight of the "off-white chunky material" found in

the coat was 0.18 grams (about 1/150th of an ounce[18]), and it contained cocaine base. The government did not disclose this to defendants until September 2008, after the conclusion of defendants' jury trial.

In *Brady* and its progeny, the Supreme Court has held that where the prosecution suppresses evidence favorable to the defendant that is material either to guilt or punishment, due process is violated. 373 U.S. at 87. This includes both directly exculpatory evidence and impeachment evidence. *See United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States,* 405 U.S. 150, 154 (1972). "[T]o establish a *Brady* violation requiring relief, a defendant must show that (1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or of impeachment value; and (3) the withheld evidence was material." *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004) (citing *Banks v. Dretke*, 540 U.S. 668 (2004)). Here, the government concedes the first two elements, but argues that the third element, materiality, is not satisfied.

"Information is material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Lambert v. Beard*, 633 F.3d 126, 133 (3d Cir. 2011) (quoting *Bagley*, 473 U.S. at 682). However, this "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted

---

[18] By way of comparison, 0.18 grams is only about 1/20 of the weight of an "eightball" (a quantity referred to numerous times during the trial), which is 3.5 grams.

ultimately in the defendant's acquittal . . . ." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The "touchstone of materiality is a 'reasonable probability' of a different result." *Id.* (quoting *Bagley*, 473 U.S. at 682). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678).

Here, defendants argue three theories of impeachment in support of the materiality of the withheld material: (1) Rhoades was preparing to frame someone through an undercover buy by producing the 0.18 gram rock containing cocaine base to the authorities after the buy and claiming he purchased it; (2) a decision was made not to prosecute Rhoades for possession of the 0.18 gram rock containing cocaine base as additional consideration in exchange for his cooperation; and (3) Rhoades was dealing and/or using drugs while acting as a government informant, contrary to his trial testimony. According to defendants, these theories demonstrate a "reasonable probability" sufficient to undermine confidence in the verdict because Rhoades "was the only witness producing any direct evidence against [defendants] on Count III of the Indictment charging possession of a firearm to further the distribution of crack cocaine."[19] The District Court, in a post-trial memorandum,

---

[19] Contrary to defendants' assertions, Rhoades was not the only witness to testify to defendants' possession of a firearm in furtherance of a drug offense. As discussed above, Jason

47

denied defendants' joint motion for a new trial based on the aforementioned theories of a *Brady* violation. Reviewing the District Court's conclusions of law *de novo* and its findings of fact for clear error, *Mitchell*, 365 F.3d at 254, we address each theory in turn and ultimately reject the *Brady* claim.

### A. Framing others

Defendants' contention that Rhoades was preparing to frame someone is casually mentioned in their appellate briefs. We note first that no factual support or legal argument is offered to substantiate the claims beyond the level of fanciful speculation. Such an attenuated and unsupported assertion does not cast doubt on the outcome of the trial and thereby constitute a *Brady* violation. *See United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984) ("[*Brady* non-disclosure] must adversely affect the court's ability to reach a just conclusion . . . .").

Second, even were this court to accept defendants' conjecture, it would not rise to the level of a "reasonable probability" sufficient to undermine confidence in the verdict. The possession of what can only be considered a minimal amount of crack cocaine (about 1/150th of an ounce), when Rhoades was asked to make a controlled buy of an amount more than one hundred times greater than that (one ounce or more), cannot reasonably be tied to an elaborate scheme to

---

McNeil testified that the defendants possessed a firearm in furtherance of their drug distribution. Moreover, in Barron's reply brief, he changes his theory and instead argues that Rhoades was not the "only witness," but instead "was a critical witness."

frame someone else.  Although not impossible, it is certainly not reasonably probable, and thus, cannot be the basis for *Brady* relief.

B.      Non-prosecution

Defendants' second contention is that the March 2007 incident was material because it was "part of the consideration provided in exchange for [Rhoades's] cooperation" which resulted in non-prosecution "for yet an additional crack cocaine violation."  This in turn would help to impeach Rhoades, defendants argue, because he would have a motive to lie to please the prosecution.

While we have recognized that "undisclosed *Brady* material that would have provided a *different* avenue of impeachment is material, even where the witness is otherwise impeached," *Lambert v. Beard*, 633 F.3d at 134 (emphasis added), "'impeachment evidence, if cumulative of *similar* impeachment evidence used at trial . . . is superfluous and therefore has little, if any, probative value,'" *id.* at 133 (emphasis in original) (quoting *Conley v. United States*, 415 F.3d 183, 189 (1st Cir. 2005)).

Here, Rhoades was already impeached by defendants with respect to his self-interested motivation in agreeing to testify against defendants.  As defense counsel noted at trial, in exchange for Rhoades's cooperation, the government dismissed two charges pending against him—possession with intent to distribute cocaine and use of a firearm in furtherance of drug trafficking.  The government also gave him a very substantial reduction in his term of imprisonment (from approximately 9–10 years to 63 months) on an additional charge of being a felon in possession of a firearm.  The value

of additional impeachment by reference to possession of 0.18 grams of crack cocaine in March 2007 is of "little, if any, probative value" because it is impeachment by the same avenue already taken by the defendants, namely Rhoades's motivation for testifying against the Walkers as part of a bargained-for reduction in criminal penalties. Defendants had already thoroughly attacked Rhoades's credibility on account of prosecutorial inducements used to secure Rhoades's testimony against defendants, and thus this avenue of impeachment does not provide a "reasonable probability" of a different outcome. *See Tankleff v. Senkowski*, 135 F.3d 235, 251 (2d Cir. 1998) ("When a witness's credibility has already been substantially called into question *in the same respects* by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim." (emphasis added)).

    C.    <u>Continued drug use and sale</u>

Defendants' final contention concerns whether Rhoades continued to use and sell drugs. They point to the following exchanges during the cross-examination of Rhoades:

> Q:    Let me turn your attention to robbery charges. Am I correct in saying that you and John McNeil had participated in robbery charges together?
>
> A:    In robbery charges together? I ain't never been in no robbery charges with him.
>
> Q:    Never?

A:   Never.

Q:   And if anybody testified to that, they're being untruthful and you are being truthful in your denial?

A:   Yes, I am.

. . . .

Q:   While you were an informant, did you deal drugs or sell drugs with Mr. McNeil?

A:   No.

Q:   Did you deal drugs or sell drugs with anybody during that period of time?

A:   No.

Q:   Okay.   So you stopped dealing drugs when?  When you were arrested on those charges in 2006?

A:   Yes.

. . . .

Q:   So you became legitimate after you were arrested?

A:   Yes.

Q:   Okay.   Now, you've testified that you brought a lot of cocaine back from New

> York, correct, Harlem, Queens, South Queens? Is that correct?

A:   Yes.

Q:   When did you bring all this cocaine and make it into crack and sell it in Harrisburg?

A:   Before the time I got caught and indicted for this.

Q:   Before you got into trouble?

A:   From 15 until then.

Q:   And now you're a different person?

A:   Yes.

A fair reading of Rhoades's testimony is that he stated (i) he did not engage in any robberies with John McNeil, (ii) anyone who said he engaged in such robberies was lying, (iii) he never sold drugs with John McNeil, and (iv) he did not sell drugs after 2006. Defendants argue that Rhoades "presented himself to the Court and jury as not having anything to do with drugs after his arrest in 2006, and as someone who was working as a government informant who had been totally rehabilitated and specifically testified that all those that said differently [by identifying him as a participant in robberies] were untruthful and not worthy of belief." Therefore, defendants argue, had the jury known of Rhoades's March 2007 possession of 0.18 grams of crack cocaine, they would not have believed "that he was telling the truth about his rehabilitation," *id.*, and thus, would not believe any of his

52

testimony regarding Counts I, II, and III.

The contradiction between Rhoades's testimony and that of other witnesses regarding Rhoades's participation in robberies was already highlighted to the jury through cross-examination and argument, and the March 2007 incident does not reflect on that contradiction.  Moreover, although Rhoades denied *selling* drugs after 2006, nowhere in his testimony does he expressly deny *possessing* or *using* drugs after that date.  The inference starting from a single instance of possession of 0.18 grams of crack cocaine and extrapolating to selling or dealing drugs is not so strong as to provide a reasonable probability that the jury would find Rhoades wholly unbelievable, as defendants argue.  Thus, disclosure of Rhoades's March 2007 possession of 0.18 grams of crack cocaine was not likely to "undermine[] confidence in the outcome of the trial."  *Bagley*, 473 U.S. at 678.

We clarify that, although the March 2007 incident is potentially a new avenue of impeachment, it is not material for *Brady* purposes.  As noted above, we have recognized that "undisclosed *Brady* material that would have provided a different avenue of impeachment is material, even where the witness is otherwise impeached."  *Lambert v. Beard*, 633 F.3d at 134.  In making this observation, we cited to two of our prior cases, *Slutzker v. Johnson*, 393 F.3d 373, 387 (3d Cir. 2004), and *United States v. Perdomo*, 929 F.2d 967, 969, 972 (3d Cir. 1991), in which different avenues of impeachment were indeed material.  However, this is not to say that *every* unexplored avenue of impeachment is *ipso facto* material; because the "touchstone of materiality is a 'reasonable probability' of a different result," *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 682), it is only those new

avenues of impeachment that sufficiently undermine confidence in the verdict that will make out a successful *Brady* claim. Indeed, our primary concern in *Lambert v. Beard* was that the Supreme Court of Pennsylvania had concluded that a witness "was so thoroughly impeached that, ipso facto, additional evidence could not have made a difference," and we held that it was "patently unreasonable to presume—without explanation—that whenever a witness is impeached in one manner, any other impeachment becomes immaterial." 633 F.3d at 133–34. Our statement in *Lambert v. Beard* is a recognition that there are some instances where specific impeachment evidence is so important (for issues such as the identity of the culprit) that it is material for *Brady* purposes even when a witness has already been effectively impeached on other issues. *See id.* at 135–36 (witness's prior reference to *another "co-defendant"* other than the accused was material even though witness had been thoroughly impeached on other grounds because witness had testified at trial that only the accused and one other person were present); *Slutzker*, 393 F.3d at 387–88 (impeachment evidence was material where the witness had previously identified *another individual* as the culprit even though the witness had been impeached by prior statements in which she failed to identify defendant as the culprit); *Perdomo*, 929 F.2d at 972 (noting that whether "the jury has had an opportunity to consider other impeachment evidence is not the correct standard for determining materiality," but instead was whether the evidence, "if *disclosed and used effectively* . . . may make the difference between conviction and acquittal" (internal quotation marks omitted) (quoting *Bagley*, 473 U.S. at 676)).

We further observe that this was not a case in which there was a lone witness providing uncorroborated testimony.

54

*Cf. Lambert v. Beard*, 633 F.3d at 134 n.3 ("'[C]onfidence in the outcome is particularly doubtful when the withheld evidence impeaches a witness whose testimony is uncorroborated and essential to the conviction.'" (quoting *Norton v. Spencer*, 351 F.3d 1, 9 (1st Cir. 2003))). Here, Rhoades's testimony was not the only testimony providing direct support to the prosecution on Counts I, II, and III— Jason McNeil independently testified at length to the defendants' conspiracy to sell drugs, actual sale of drugs, and possession of a firearm in furtherance of those drug sales, corroborating Rhoades's testimony. While it is regrettable that the government did not disclose the March 8, 2007, incident prior to trial, the government's mistake does not rise to the level of a *Brady* violation.

## VII.  **Conclusion**

For the foregoing reasons, the District Court's judgments of conviction and sentence will be affirmed in all respects.

55